735 P.2d 1373

Frank ARIES,
Plaintiff/Appellee/Cross-Appellant,

v.

PALMER JOHNSON, INC.,
Defendant/Appellant/Cross-Appellee.

No. 2 CA–CV 5914.

Court of Appeals of Arizona,
Division 2, Department A.

March 24, 1987.

252

Miller & Pitt, P.C. by Gerald Maltz and Anne M. Ryan, Tucson, for plaintiff/appellee/cross-appellant.

Slutes, Sakrison, Grant & Pelander, P.C. by John Pelander, Tucson, for defendant/appellant/cross-appellee.

## OPINION

HOWARD, Presiding Judge.

This is an action by the purchaser of a yacht (Aries) against the manufacturer/seller for breach of contract, breach of warranty, and fraud. The defendant Palmer Johnson, Inc. (PJ) filed a counterclaim for wrongful interference with prospective business. The trial court granted plaintiff's motion for summary judgment on the counterclaim. PJ has not appealed from this summary judgment.

The action was tried to the court, sitting without a jury, which found that PJ breached its contractual promise concerning time of delivery, breached express and implied warranties as to description and quality, and defrauded Aries in regard to the boat's promised delivery date. The court awarded Aries $218,795.58 in damages together with attorney's fees in the sum of $70,-523.25 pursuant to A.R.S. § 12–341.01, but refused to include in the award of attorney's fees any amounts incurred by paralegals.

The record discloses the following facts. Aries, a resident of Tucson, is a sophisticated and experienced real estate developer. From 1966 to 1975 he owned a series of relatively moderately priced yachts. In 1978 he purchased a 70–foot sailing yacht named "Varuna" for approximately $420,-000. He made substantial personal use of Varuna which he also chartered, for a fee, to a corporation of which he was the president and sole shareholder.

PJ is a Wisconsin corporation with its principal place of business in Sturgeon Bay, Wisconsin. It is engaged in the business of constructing, storing, repairing, and selling custom sailing yachts throughout the United States, including Arizona, and holds itself out as being internationally famous for constructing yachts of the finest quality.

In 1978 Aries met Mike Kelsey, the president of PJ, and was invited to Florida by Kelsey to inspect a boat constructed by PJ, an "Alden 75" yacht which was named "Ma-Mu 5." About two years later, in 1980, Aries entered into a contract with PJ for the purchase of an Alden 75 for $925,-000. However, he was unable to obtain financing, and the parties agreed to cancel the contract. Thereafter, Kelsey kept in contact with Aries by telephone and mail, transmitting promotional material to Aries and soliciting the purchase of a new yacht. During this period Aries also read various boating and yachting magazines in Arizona which contained advertisements by the defendant representing itself as a manufacturer of the finest quality custom sailing yachts.

In August of 1982, Aries sent PJ $100,000 as a deposit toward the purchase of an Alden 75 yacht, to be called "Scheherazade." The boat was to be a "sister ship" to Ma-Mu 5, except for certain design changes. On September 1, 1982, Aries sent a letter to PJ which contained a list of specifications for the new yacht. He also inquired about a queen-size bunk for the master stateroom and asked Kelsey's opinion as to whether it could be done. Fifteen days later, PJ signed and mailed one of its standard form contracts for Aries' signature. The contract price was $1,237,500. The delivery date was "on or about June 25, 1983" in accordance with prior discussions between Aries and Kelsey wherein Aries told Kelsey of his intended use of the yacht for the summer of 1983. One day after mailing the contract, PJ wrote Aries in response to his September 1 letter. PJ did not address the issue of the queen-size bunk, but stated that construction was already under way and that PJ expected no problem in completing the yacht by the scheduled delivery date of June 25, 1983.

On November 6, 1982, Aries signed the contract but made a change in it before mailing it back to PJ, which did not reject the change.[1] The contract provided that the boat would be complete in "every detail" in regard to workmanship, material, and equipment "in accordance with the Plans and Specifications." In case of conflict, the contract provided that it would control first, the specifications second, and the prints third. The specifications to the contract provide in part that:

"Builder will assist Owner in reproduction of revised plans as items discussed for those items in Owner's letter to M. Kelsey as September 1, 1982 consisting of ... redesign of galley area for settee ... redesign of stateroom areas making bunks as wide as possible ... modifications to the master stateroom head enlarging it as per new revised plans and Owner request."

The specifications also provided that the owner's quarters were to be larger than those on Ma-Mu 5, port and starboard. Aries paid PJ all sums of money that were due under the contract.

On January 20, 1983, Aries wrote Kelsey and stated that he was not happy with the plans for the crew's quarters which PJ had sent to him for review. In this letter Aries included another arrangement for the quarters. On January 27, 1983, Aries wrote to Bjorn Johansen, PJ's superintendent of construction, setting forth a number of items discussed in a previous telephone call between them. Many of these items dealt with interior appliances and furniture. Johansen responded to that letter on February 25, 1983. The response made no mention of any delay as a result of the items considered in either the January 20 or January 27 letters.

From the fall of 1982 until early spring of 1983, Aries had regular conversations with Kelsey and Johansen concerning the progress of the construction. It was uncontradicted that in these conversations Aries was advised that construction was proceeding on schedule and that the contract delivery date would be met. Pictures of the progress of construction sent by PJ to Aries in the fall of 1982 and the winter of 1983 showed what appears to be a shell with no completed interior work.

The construction of Scheherazade was part of PJ's overall production schedule, without individual project managers, which included three other yachts. Of those yachts, Ondine had a contract delivery date of April 30, 1983, Centurian had a past due contract delivery date of June 15, 1982, and Kongere had a contract delivery date of April 1, 1983. The Ondine contract contained a $2,000 per day late charge provision personally guaranteed by the individual owners of PJ. Aries' contract with PJ contained no such penalty. PJ's record showed work hours doubled and tripled on Ondine from the spring to summer 1983, and that the hours on Scheherazade were

---

1. Under the Uniform Commercial Code the contract was accepted by Aries since his acceptance was not expressly made conditional on assent to the different terms. A.R.S. § 44–2314 (now A.R.S. § 47–2207); see *Autonumerics, Inc. v. Bayer Ind., Inc.,* 144 Ariz. 181, 696 P.2d 1330 (App.1985).

correspondingly reduced during that period. PJ stopped carpentry work on Scheherazade during October, November and December 1982 and most of January 1983. Aries was not informed of this in letters from PJ dated December 30, 1982 and January 6, 1983 indicating that construction was on schedule, nor was Aries otherwise informed of this by PJ. Neither Ondine, Centurian nor Kongere were delivered on time.

In late May or early June of 1983, Aries sent his yacht captain to Sturgeon Bay to be present for what Aries believed to be the final weeks of construction. The captain advised Aries that the boat was not even near completion. Aries personally visited Sturgeon Bay on June 6, 1983, and observed what appeared to be a vessel in the final stages of completion and a larger force working on Ondine than on his yacht. He expressed these observations in a letter to Kelsey on June 15, 1983, and Kelsey's June 18 response did not dispute Aries' observations but rather promised delivery in time for Aries to be at the America's Cup with "a perfect boat." Kelsey's letter stated that they were spending many more hours than they had hoped, but he did not indicate that any of the additional time was the result of anything done by Aries. In June 1983, PJ promised Aries delivery of his boat in early August.

In August 1983, PJ had not completed the boat but it promised delivery to Aries in September. On August 25, PJ's lawyer wrote Aries' lawyer stating that the boat would be delivered on or before September 24, 1983, and would be "of the finest quality that Palmer Johnson can construct...." In that letter, Aries' claims for damages due to delay were denied, but there was no mention as to the specific causes for delay and no statement that Aries was in any way responsible for the delay.

The boat was not delivered until November 23, 1983, five months late, depriving Aries of all use during the summer and fall of 1983. After delivery, it promptly broke down. It was dry-docked in a repair facility for approximately 168 days during the year following delivery. Defects in quality and material were wide ranging, from delaminating paint, to drill holes in the hull, to a jerry-rigged sewage tank system which was vented near the cabin portholes.

Aries informed PJ repeatedly, both before and after executing the contract, of his intended use of the boat during the summer and fall of 1983, which included the "shakedown cruise" in Lake Michigan, attendance at the quadrennial America's Cup races in August and September, and then on to the Caribbean. From the time the contract was executed in the fall of 1982, to the early spring of 1983, PJ's president and construction superintendent repeatedly assured Aries that construction was proceeding in a timely manner and that delivery would be timely. The record shows that Aries relied on those representations to his detriment. For example, he decommissioned the yacht he then owned and did not secure a substitute vessel for his intended use during the summer and fall of 1983.

For the first time, at trial, PJ contended that the delay was due to Aries' changes of the boat's interior. The trial court found that this defense was not credible, that PJ had ample opportunity to mention this to Aries, but did not, and that reasonable changes in custom sailing yachts during construction were foreseeable.

PJ contends the trial court erred (1) in finding and exercising personal jurisdiction over PJ; (2) in admitting certain expert witness testimony and denying its motion for a continuance; (3) in applying Arizona rather than Wisconsin substantive law; (4) in finding PJ solely responsible for the entire delay in the boat's completion and delivery; (5) in finding and assessing damages for loss of use, diminished value due to tank capacity, for mast removal and replacement, and for surveyor's expenses; and (6) in assessing attorney's fees against PJ.

Aries has cross-appealed, contending the trial court erred in not including paralegal fees as attorney's fees, in failing to include certain amounts of alleged undisputed damages and in failing to award prejudgment

interest on certain items of liquidated damages.

## JURISDICTION

PJ contends Arizona's exercise of jurisdiction over it violates due process. Aries has two responses to this contention. First, he asserts that PJ filed a permissive counterclaim which constituted a waiver of its jurisdictional defense. Second, he argues that PJ had sufficient minimum contacts with this state to allow the court to exercise jurisdiction.

■ The filing of a permissive counterclaim constitutes a waiver of any jurisdictional defenses. *National Homes Corp. v. Totem Mobile Home Sales, Inc.*, 140 Ariz. 434, 682 P.2d 439 (App.1984); *Carlton v. Emhardt*, 138 Ariz. 353, 674 P.2d 907 (App.1983). The counterclaim, for alleged wrongful interference with prospective business relations, contained the following paragraph:

"7. In or around November, 1983, and at other times, Aries made statements to Palmer Johnson and others, indicating that he (Aries) had sought out people who were planning on having boats constructed by Palmer Johnson and had purposely 'killed' sales of boats for potential Palmer Johnson customers; and Aries has otherwise threatened and attempted to destroy or damage Palmer Johnson's business, through disparaging remarks and discouraging prospective customers of or sales by Palmer Johnson."

PJ contends that its counterclaim was compulsory rather than permissive and did not constitute a waiver of the defense of lack of personal jurisdiction. We agree with PJ. Rule 13(a), Rules of Civil Procedure, 16 A.R.S., provides that a counterclaim is compulsory if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim. The test to determine if a counterclaim is compulsory or permissive is whether there is any logical relation between the claim and counterclaim. *Occidental Chemical Co. v. Connor*, 124 Ariz. 341, 604 P.2d 605 (1979). If there is, the counterclaim is compulsory. Here, the subject of the complaint and the subject of the counterclaim logically relate to the construction of the yacht. The counterclaim was, therefore, compulsory and its assertion did not constitute a waiver of jurisdictional defenses.

The question then is whether the trial court's exercise of long-arm jurisdiction offended "traditional notions of fair play and substantial justice" embodied in the Due Process Clause of the Fourteenth Amendment. *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

■ Individuals must have "fair warning" that a particular activity may subject them to the jurisdiction of a foreign court. *Shaffer v. Heitner*, 433 U.S. 186, 218, 97 S.Ct. 2569, 2587, 53 L.Ed.2d 683, 706 (1977) (Stevens, J., concurring). This "fair warning" requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities. *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984). When the defendant has purposefully directed his activities at the residents of the forum state, he cannot avoid jurisdiction merely because he did not physically enter the state, and he must present a compelling case that the presence of other considerations would render jurisdiction unreasonable. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

■ Turning to the facts here, we believe the record supports the trial court's conclusion that the assertion of jurisdiction over PJ did not offend due process. PJ manufactures and sells luxury yachts to customers throughout the United States, including Arizona. It regularly advertises in "Sailing" magazine and other yachting publications circulated in Arizona. "Sailing" magazine has a national circulation and subscribers in Arizona. PJ's advertisement in "Sailing" regularly consists of a full page. PJ mailed brochures, promotional literature, plans and boat specifications to Arizona and had its representatives soli-

cit Aries by calling him in Arizona. The contract for building the boat was negotiated primarily by means of telephone calls to and from Arizona. The misrepresentations which form the basis of Aries' fraud claim were made to Aries in Arizona by telephone and mail. Moreover, this was not a minor transaction. The contract price was for $1.25 million and was to be paid by an Arizona resident.

In short, PJ purposefully solicited an Arizona resident to enter into a contract for $1.25 million to build a boat in Wisconsin. The contract was entered into in Arizona. See *Molybdenum Corp. of America v. Superior Court in and for County of Pima*, 17 Ariz.App. 354, 498 P.2d 166 (1972). It communicated false and fraudulent statements to the resident in Arizona. Arizona clearly has a legitimate interest in protecting its residents from fraud by an out-of-state business. *Rhoads v. Harvey Publications, Inc.*, 124 Ariz. 406, 604 P.2d 670 (App.1979). PJ reached out beyond its borders in Wisconsin in order to derive a commercial benefit from Arizona. It is a national corporation and as such, cannot reasonably believe that those from whom it solicits business will forego access to the courts of their states of residence.

While each of these factors, considered in isolation, might not be sufficient to sustain jurisdiction, when considered as a whole they support the conclusion that PJ purposefully established minimum contacts with Arizona. Because PJ has failed to demonstrate how the exercise of jurisdiction here would otherwise be fundamentally unfair, *Burger King Corp. v. Rudzewicz*, supra, we conclude that Arizona's exercise of jurisdiction did not offend due process.

## THE EXPERT WITNESS AND THE CONTINUANCE

More than a week before the trial, PJ made a motion to preclude or limit any testimony or opinions of Aries' marine expert, Jeff Johnson, whose deposition PJ had previously taken, on the ground that any new testimony or opinions had not been timely or properly disclosed during pretrial discovery. This motion was heard by the court on the date set for trial, February 11, 1986. Instead of ruling on the motion in limine, the trial court postponed the trial until the next day, giving PJ an opportunity to depose Johnson again. The trial court then told the attorneys to appear the next day, one hour prior to trial, at which time it would rule on whether or not any new testimony justified the granting of a continuance.

■ PJ took Johnson's deposition that afternoon and the next morning, before the trial was to commence, PJ orally moved to continue the trial because of alleged new testimony by the witness. After hearing argument by counsel for both parties, the trial court denied the motion to continue. The trial started and Johnson was allowed to testify as to the alleged new matters. PJ claims the trial court erred in denying its motion to continue and in allowing the testimony. We do not agree for two reasons. First, PJ's motion for continuance was not in writing and supported by an affidavit showing sufficient cause, as is required after a case is set for trial. *Valley Nat. Bank of Arizona v. Meneghin*, 130 Ariz. 119, 634 P.2d 570 (1981). Second, a motion for continuance is addressed to the sound discretion of the trial court and its ruling will not be disturbed unless that discretion has been abused. *Yates v. Superior Court in and for Pima County*, 120 Ariz. 436, 586 P.2d 997 (App.1978). The record discloses that the trial judge did not abuse her discretion. Johnson is a marine consultant whom Aries retained August 19, 1983, two and one-half years prior to trial, to represent him in his dealings with PJ after Aries became exasperated with the delay and broken promises. Johnson dealt with PJ on Aries' behalf from that time until the action was filed, including an episode in which it was discovered that PJ had failed to provide the boat with the specified water tank capacity.

Johnson was disclosed as Aries' expert witness in answers to interrogatories and in the pretrial statement, and PJ took his deposition twice before trial. Before his first deposition, Johnson's file, including

his resume, reports, and correspondence, was turned over to defense counsel. At his first deposition, his file was further reviewed by defense counsel, including his report dealing with the lack of specified holding tank capacity. Johnson's two depositions consumed more than five hours of time and 150 pages of transcript. PJ's expert witness was in attendance at both depositions, and at the second deposition PJ's assistant yard superintendent was also present.

PJ contends the trial court erred because Johnson gave two opinions in his second deposition which he had never expressed before, which made it necessary for a continuance so evidence could be gathered to counter these opinions. The first opinion was Johnson's interpretation of PJ's monthly man-hour reports. The second was his opinion that the boat had diminished in value by $30,000 because of the reduced tank capacity.

As for PJ's man-hour reports and Johnson's opinion thereon, there has been no showing how PJ was prejudiced by Johnson's testimony. Those records were PJ's own records, and PJ had over two years to review and analyze those records in preparation for trial. As for Johnson's testimony on the subject of tank capacity, PJ knew well in advance of trial that Aries was claiming that he was damaged by the lack of specified tank capacity and, in fact, offered testimony from two expert witnesses to counter this testimony. As to the issue of diminution in the value of the boat, since PJ claimed there was no reduced tank capacity and accordingly no diminution in the value of the boat, it is difficult to see how PJ was prejudiced by failing to have an opportunity to bring in an expert witness to testify as to the diminution of the value of the boat due to the lack of specified tank capacity.

## THE CONFLICT OF LAWS ISSUE

PJ contends the trial court erred in applying Arizona substantive law to this case

instead of Wisconsin law. Specifically, PJ contends that the court erred in finding it guilty of consumer ·fraud because Wisconsin does not have a statute similar to our Consumer Fraud Act, A.R.S. §§ 44–1521 et seq. PJ also contends the court erred in applying Arizona law in awarding attorney's fees pursuant to A.R.S. § 12–341.-01(A), since Wisconsin does not have a comparable statute.[2]

The question of whether the law of a particular state can be applied to a transaction is different from the question of whether the courts of that state have jurisdiction to enter a judgment. *Rhoads v. Harvey Publications, Inc.*, supra. Since the court found that PJ had committed common law fraud, which requires proof in addition to that required by the Arizona Consumer Fraud Act, as well as fraud under the Act, it has not been harmed by any erroneous application of Arizona law.

Aries contends that the issue of attorney's fees is procedural and that it is, therefore, governed by the law of the forum. PJ contends that the awarding of attorney's fees under A.R.S. § 12–341.-01(A) is not procedural, but a matter of substantive law which under the law of this state requires application of Wisconsin law.

Procedural matters are usually governed by the law of the forum. *Ross v. Ross*, 96 Ariz. 249, 393 P.2d 933 (1964). In *Taylor v. Security Nat. Bank*, 20 Ariz. App. 504, 514 P.2d 257 (1973), the court applied the law of the forum, Arizona, pursuant to the Restatement (Second) of Conflicts §§ 122 and 135 (1971), to decide the necessity for and sufficiency of the evidence in establishing the reasonable value of the attorney's fees sought. This is because the issue involved procedure. However, when the issue does not involve procedure, the local law of the state having the most significant relationship to the transaction and the parties is the law to be applied in the absence of an effective choice of law by the parties. *Taylor v. Security Nat. Bank*, supra; Restatement

2. In Wisconsin, attorney's fees are not recoverable in the absence of a statute or enforceable contract providing for them. *See Kremers-Ur-* *ban Co. v. American Employers Ins. Co.*, 119 Wis.2d 722, 351 N.W.2d 156 (1984).

(Second) of Conflicts § 188. The measure of recovery for a breach of contract is determined by the local law of the state having the most significant relationship. Restatement (Second) of Conflicts § 207. We believe that the recovery of attorney's fees under A.R.S. § 12–341.01(A) is a form of damages and is to be determined by the principles set forth in the Restatement (Second) of Conflicts § 188,[3] which provides in part:

"(2) In the absence of an effective choice of law by the parties (see § 187), the contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place of contracting,

(b) the place of negotiation of the contract,

(c) the place of performance,

(d) the location of the subject matter of the contract, and

(e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

These contacts are to be evaluated according to their relative importance with respect to the particular issue."

Section 6 provides:

"Choice-of-Law Principles

(1) A court, subject to constitutional restrictions, will follow a statutory directive of its own state on choice of law.

(2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied."

The evidence shows that the contract was entered into in Arizona and one party was domiciled in Arizona. Performance and payments were to be in Wisconsin, the domicile of the other party. Negotiations were by mail and telephone and actually occurred in both states.

■ When evaluating these contacts, in light of the particular issue involved, the awarding of attorney's fees, we believe Arizona is the state with the most significant contact. The purpose of A.R.S. § 12–341.-01(A) is to mitigate the burden and expense of litigation to establish a just claim or defense. The litigation is occurring in this state and Wisconsin has no interest in whether attorney's fees are or are not recoverable in an Arizona action. The trial court did not err in awarding attorney's fees.

## DAMAGES FOR LOSS OF USE

The trial court awarded Aries $100,000 for loss of use of the yacht before delivery and $20,000 for loss of use after delivery. PJ contends the trial court erred in awarding any damages for loss of use because (1) they were speculative, (2) PJ had no knowledge of Aries' intended use of the boat when it entered into the contract, (3) no substitute vessel was actually rented, and (4) the loss of rental value used to compute the damages for loss of use failed to take into account expenses which were necessary in order to rent the vessel.

---

**3.** In *Seattle-First Nat. Bank v. Schriber,* 51 Or. App. 441, 625 P.2d 1370 (1981), the court held that statutes authorizing the recovery of attorney's fees were substantive in nature and not procedural. The following cases treat the right to attorney's fees as substantive in nature: *Robert McMullan & Son, Inc. v. U.S. Fidelity and Guaranty Co.,* 103 Cal.App.3d 198, 162 Cal.Rptr. 720 (1980); *Prospero Assoc. v. Redactron Corp.,* 682 P.2d 1193 (Colo.App.1983); *Oliver B. Cannon & Son, Inc. v. Dorr-Oliver, Inc.,* 394 A.2d 1160 (Del.1978); *Bernick v. Frost,* 210 N.J.Super. 397, 510 A.2d 56 (1986); *Citizens First Bank v. Intercontinental Express, Inc.,* 77 Or.App. 655, 713 P.2d 1097 (1986).

■ Damages for loss of use are appropriate under the Uniform Commercial Code if the seller had knowledge of the buyer's intended use of the goods at the time of contracting and the buyer proves that there are periods when the goods would have been used but were not because of defects that the buyer, in good faith, was waiting for the seller to cure. Damages are recoverable for only those days the goods would have been in use. *Seekings v. Jimmy GMC of Tucson, Inc.,* 130 Ariz. 596, 638 P.2d 210 (1981). This would also apply to the failure to deliver the goods on the date promised in the contract. See *Barbarossa & Sons, Inc. v. Iten Chevrolet, Inc.,* 265 N.W.2d 655 (Minn. 1978). One is entitled to use his property for pleasure as well as business, and a loss of use recovery is allowed as to pleasure vehicles as well as to business vehicles. See *Seekings v. Jimmy GMC of Tucson, Inc.,* supra; and see Dobbs, Remedies § 5.10 at 384 (1973).

■ Aries' damages for loss of use of his yacht are measured by its reasonable rental value at the time of the loss. *Home Indem. Co. v. Bush,* 20 Ariz.App. 355, 513 P.2d 145 (1973). His failure to actually rent a substitute yacht does not preclude him from recovering such damages. *Seekings v. Jimmy GMC of Tucson, Inc.,* supra.

An excellent discussion on the loss of use of a motor home and entitlement to damages under the Uniform Commercial Code is contained in the Minnesota case of *Jacobs v. Rosemount Dodge-Winnebago South,* 310 N.W.2d 71, 78 (Minn.1981):

"Whatever the measure of damages, the buyer 'must prove by credible evidence to a reasonable certainty that such damages were suffered and must prove, at least to a reasonable probability, the amount of these damages.' [citation omitted] It is not necessary, nor would it be possible for the buyer to minutely detail each element of damage. Such a burden would, as the McGrady court noted, dilute if not repeal the substantive remedy. [citation omitted] It is for the trier of fact, in this case the jury, to

assess damages for loss of use so long as that assessment is reasonable and not punitive.... Where the measure of damages is not easily amenable to mathematical precision, the trier of fact must consider the general or particular needs of the buyer which the seller could have known at the time of contracting. [citations omitted] In considering the needs of the buyer, the specific buyer's needs and circumstances must be considered, not those of the average buyer. [citations omitted]"

There was ample evidence of Aries' intended use of the yacht during the five months' period of delayed delivery, and there was evidence that PJ knew of Aries' intended use of the yacht when the contract was entered into. Aries testified that had the ship been delivered on time or reasonably close, he would have used it for a one-month shakedown cruise on Lake Michigan and then a trip up the St. Lawrence Seaway and on to Newport, Rhode Island to attend the quadrennial America's Cup trials and finals in August and September. After the America's Cup, Aries intended to take the yacht to the Caribbean, where it was his habit to spend at least ten days per month. Aries' intended use was consistent with the trial court's finding of his substantial use of his prior yacht, Varuna. Aries testified that he used Varuna approximately ten days per month during the winter season in the Caribbean, took numerous trips from the east to the west coast of the United States through the Panama Canal, as well as cruises in the Mediterranean. He testified that his boat was his sanctuary and refuge and that he intended to use it as much as reasonably possible. The trial court did not award loss of use for all five months; instead, it awarded loss of use for two-thirds of this time.

■ As for post-delivery loss, the trial court awarded Aries $20,000 for loss of use for 20 of the 168 days that the yacht was being repaired during the year after its delivery. Aries' expert witness, Johnson, testified that 30 days' downtime for repair ("warranty") was normal during the first year, and that 60 days was excessive. PJ's

expert estimated that 50 to 80 of the 168 days were attributable to warranty work, as distinguished from items such as owner preference work.

We believe there was sufficient evidence of postdelivery loss of time to support the court's award. Furthermore, as to the pre-delivery loss, the court did not award damages for the entire five months, but only for two-thirds of that time.

Aries testified that, based on his long experience as the owner of a charter company, $1,500 per day was at the low end of the reasonable range to charter a comparable boat under normal circumstances. He further testified that the cost of a comparable boat during the America's Cup would have been $5,000 to $7,000 per day. Finally, he testified that he would have charged $2,000 per day to charter his boat for business purposes.

Johnson testified that $1,500 per day was a reasonable charter rate for a comparable boat under normal circumstances without consumable and crew expenses. Johnson testified that the minimum charter rate for a comparable vessel during the America's Cup would be $3,000 per day.

 PJ's executive vice president, Parsons, testified that the reasonable charter value under normal circumstances was $8,500 per week or $1,200 per day averaged on a weekly rate. He also testified, however, that the loss of use in 1983 could have been $1,500 per day. There was also evidence that Ondine, one of the other boats that was being built, contained a $2,000 per day penalty provision that was personally guaranteed by PJ's shareholders. The $2,000 per day rate was a negotiated estimate of loss of daily use for late delivery of that boat. There was evidence as to the daily cost of consumables and crew expenses that would have to be deducted against the rental rate. We presume the trial court took these sums into account, and we find no error in its award of $1,000 per day damages.

## THE WATER TANKS AND THE DELIVERY IN DELIVERY

The issues involving the boat's water tanks and the cost for the delay in delivery involved no issues of law and are an attack on the sufficiency of the evidence. A lengthy discussion of the facts surrounding these issues serves no useful purpose other than to unduly lengthen this opinion. Suffice it to say that since there was conflicting evidence on these issues, we defer to the trial court on these matters.

## REMAINING ISSUES

 The trial court awarded Aries the sum of $10,363, the amount he paid Johnson when he hired him to determine the cause in the delay of delivery and to mitigate any further delay. PJ claims that awarding this sum as damages was error because the trial court does not have authority to award Aries his expert witness fees. This contention is without merit, since the trial court did not include any sums for work performed by Johnson in his capacity as a trial preparation work expert or as an expert witness, the fees awarded being limited solely to his consulting services prior to the time of delivery.

Aries testified that his original intended delivery route was from Lake Michigan out the St. Lawrence Seaway to the North Atlantic and then south, but because of the delay in delivery from early summer to late fall and the prospect of taking an untested pleasure craft into a northern seaway that freezes in winter, the route south was changed to the Mississippi River. This decision was made in consultation with PJ's representatives.

 The boat, when finally delivered, had the masts in place, but the masts had to be removed and placed on deck due to the rerouting because they were too tall to pass under some of the bridges on the Mississippi. PJ charged Aries $5,731 to take the masts down, and it cost Aries $2,378.21 to have the masts put up again when he reached New Orleans. This would not have occurred if the boat had been delivered on time. The trial court awarded damages to reimburse him for the cost of the masts' removal and replacement. PJ contends that this was erroneous because there was evidence that the St. Lawrence

Seaway did not freeze over and close until December 15, 1983, and there was, therefore, no necessity to remove the masts. We do not agree. The question was whether it was unreasonable for Aries and defendant's employees to change the route at the time they did, not having the power to predict when the St. Lawrence Seaway was going to freeze. The trial court found that Aries acted reasonably in changing the route after delivery; we cannot gainsay the trial court's determination.

### THE CROSS–APPEAL

In his cross-appeal, Aries contends that the trial court erred in not awarding fees for paralegal services as attorney's fees under A.R.S. § 12–341.01, in failing to award him certain damages which were uncontraverted and in refusing to give him prejudgment interest on liquidated amounts that were included in the total judgment. Division One of this court recently held that paralegals (including paralegals, legal assistants and law clerks) may perform legal services properly considered as a component in an award of attorney's fees under A.R.S. § 12–341.01. *Continental Townhouses East Unit One Assoc. v. Brockbank*, 152 Ariz. 537, 733 P.2d 1120 (App.1986). We agree that these fees may be awarded. We do not know if the trial court denied paralegal fees as a matter of law, or in its discretion. We therefore remand on this issue, to allow the trial judge an opportunity to determine what amount, if any, should be awarded to plaintiff for paralegal services.

Aries testified that PJ overcharged him $581.40 for fuel. Since this testimony was uncontradicted, Aries contends that the trial court erred in failing to award him this sum of money. We do not agree. The trial court is not bound to accept as true the uncontradicted testimony of an interested party. *Carrasco v. Carrasco*, 4 Ariz.App. 580, 422 P.2d 411 (1967). This also applies to Aries' contention that the trial court erred in failing to award him the sum of $4,000 based on his unrefuted testimony that he paid that sum to the Boy's Club when he had to cancel a charitable charter because of PJ's failure to timely deliver the boat.

Prejudgment interest on a liquidated claim is a matter of right. *Fleming v. Pima County*, 141 Ariz. 149, 685 P.2d 1301 (1984). A claim is liquidated when it is subject to mathematical computation without reliance upon opinion or discretion. *Id.* In its findings of fact and conclusions of law, the trial court made a breakdown of the compensatory damages. Included in the damages were the following: crew expenses before delivery (late)—$16,156; payments to Johnson before delivery—$10,363; mast removal and replacement—$8,109; and crew expense after delivery—$1,905. There is no doubt that each one of these items was liquidated, and the trial court erred in its failure to give prejudgment interest on these items. The record shows that the prejudgment interest on all of these items was the sum of $8,493, which shall be awarded to Aries on remand.

Appellee has requested and will be awarded attorney's fees on appeal upon filing a statement of costs pursuant to Rule 21(a), Rules Of Civil Appellate Procedure, 17 A.R.S. (1985 Supp.).

HATHAWAY, C.J., and FERNANDEZ, J., concur.