NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

MAURICE N., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, M.N., *Appellees.*

No. 1 CA-JV 16-0328
FILED 4-27-2017

Appeal from the Superior Court in Maricopa County
No. JD528413
The Honorable Karen L. O'Connor, Judge

**AFFIRMED**

COUNSEL

John L. Popilek, P.C., Scottsdale
By John L. Popilek
*Counsel for Appellant*

Arizona Attorney General's Office, Mesa
By Nicholas Chapman-Hushek
*Counsel for Appellee Department of Child Safety*

**MEMORANDUM DECISION**

Judge Lawrence F. Winthrop delivered the decision of the Court, in which
Presiding Judge Randall M. Howe and Judge Jon W. Thompson joined.

**W I N T H R O P**, Judge:

**¶1**        Maurice N. ("Father"), the biological father of M.N. ("the child"), appeals the juvenile court's order terminating his parental rights to the child on the ground of six months' time-in-care.[1]  Father challenges the sufficiency of the evidence supporting the statutory basis found by the court and argues that the Department of Child Safety ("DCS") failed to provide him with appropriate services, but he does not contest the court's finding that severance was in the child's best interest.  For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY[2]

**¶2**        In 2009, Father was charged with Count I, possession of marijuana for sale, a class four felony; Count II, possession of drug paraphernalia, a class six felony; Count III, misconduct involving weapons (possession of a sawed-off shotgun, a prohibited weapon), a class four felony; and Count IV, misconduct involving weapons (possession of a handgun during the commission of an enumerated felony), a class four felony, all stemming from an October 9, 2008 incident that involved a fight and/or stabbing in and around Father's apartment, from which he was allegedly selling drugs.  In July 2010, Father pled guilty to amended Count I, solicitation to commit possession of marijuana for sale, a class six undesignated felony, in exchange for dismissal of Counts II, III, and IV.  The trial court placed Father on standard probation for eighteen months.  Father consistently failed to comply with the conditions of his probation, however, and at least twice his probation officer petitioned to revoke his probation based on allegations that Father failed to report to his probation officer three times, twice failed to advise his probation officer of a change in residence, possessed or used marijuana on four occasions, missed six drug tests (and tested positive on one other), failed to participate and cooperate in substance abuse treatment and counseling and other counseling, failed to maintain employment, and failed to pay probation fees, fines, and other charges.  Although Father admitted violating conditions of his probation, the court reinstated probation, revised the expiration date, and eventually

---

[1]     The court also severed the rights of the child's biological mother ("Mother").  Mother is not a party to this appeal.

[2]     We view the facts and reasonable inferences therefrom in the light most favorable to affirming the juvenile court's order.  *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549, ¶ 7, 225 P.3d 604, 606 (App. 2010).

discharged Father from probation in November 2012, with fees, fines, and other charges still outstanding.[3]

¶3 In April 2014, Father and his one- or two-year-old daughter (who was also Mother's daughter) left Arizona and moved in with Father's parents in California—leaving Mother pregnant with the child in Arizona. Mother had substance abuse issues, having previously tested positive for opiates and marijuana, and when the child was born in September 2014, his meconium (initial stool sample) tested positive for marijuana.

¶4 DCS insititued a safety plan, placing the child with a maternal aunt (with whom Mother also lived), and assigning a Family Preservation Team to assist Mother and offer her services; however, Mother was substantially noncompliant and continued to test positive for opiates and marijuana, as well as methamphetamine. In December 2014, the maternal aunt removed Mother from the aunt's home due to Mother's penchant for bringing unknown men into the home, a practice the maternal aunt would not accept due to her status as a relative foster care provider.

¶5 On January 16, 2015, DCS petitioned to have the juvenile court adjudicate the child dependent as to both parents. As to Father, DCS alleged the child was dependent based on abandonment, neglect, and substance abuse.[4]

¶6 DCS maintained that, despite several attempts, it had been unable to contact Father, and on January 21, 2015, DCS utilized a parent-locate service to find Father, who contacted DCS the next day. DCS advised Father that he must establish paternity of the child and referred Father for

---

[3] In April 2012, Father admitted violating condition 3—that he had absconded after failing to report to his probation supervisor on multiple occasions—and in September 2012, Father admitted violating condition 12—that he possessed or used an illegal drug or controlled substance (after testing positive for marijuana) and did not submit to drug testing as directed by his probation officer. When questioned at the severance hearing about his previous violations of probation, however, Father did not acknowledge that he had violated the conditions of his probation by failing to show sobriety.

[4] The juvenile court adjudicated the child dependent as to Mother on February 23, 2015, and ordered a case plan of family reunification concurrent with severance and adoption.

a paternity test. Over the next four months, however, Father missed three scheduled paternity tests, maintained only minimum contact with DCS, and made no effort to contact the child.[5] Finally, on May 27, 2015, Father submitted to the test, which confirmed his paternity of the child.

¶7 On May 29, 2015, Father appeared at a report and review hearing, and denied the allegations of the dependency petition. Father was advised that before he could unite with the child, he would need to show sobriety by providing a negative rule-out drug test, comply with services recommended by DCS, commit to caring for the child by regularly contacting him, and secure stable employment and housing, which could be verified by disclosing paystubs and a signed lease.

¶8 Father declined to take a rule-out drug test after the May 29 hearing, and over the next several months, DCS arranged for urinalysis testing in Arizona and California, and offered visitation services in Arizona because it could not transport the child to and from California. During the next eight months, however, Father missed at least seven scheduled rule-out urinalysis tests.[6] Father also failed to stay in regular contact with DCS and visit the child—even when Father appeared for case-related hearings in Arizona.[7]

¶9 On August 13, 2015, the court adjudicated the child dependent as to Father, and ordered a case plan of reunification concurrent with severance and adoption. Father failed to appear at that hearing.

¶10 On October 27, 2015, the juvenile court ordered the case plan changed to severance and adoption, and on November 16, 2015, DCS moved to terminate the parents' rights. As to Father, DCS alleged the statutory ground of six months' time-in-care as the basis for severance. *See*

---

[5] At the severance hearing, Father contended he missed the first three paternity tests because the testing locations were too far from where he lived, and he could not drive to them because his driver's license had been suspended since he was nineteen years old. (Father was thirty-three years old at the time of the hearing.) He also admitted he had been recently arrested "for a failure to appear on a driving on a suspended license."

[6] DCS considered Father's missed tests as being positive for banned substances.

[7] Father also made no effort to contact the child through correspondence or to request telephonic visitation.

Ariz. Rev. Stat. ("A.R.S.") § 8-533(B)(8)(b) (Supp. 2016). DCS also alleged that it had "made a diligent effort to provide appropriate reunification services" but that Father had "substantially neglected or willfully refused to remedy the circumstances that cause[d] the child[] to be in an out-of-home placement." Father had still not participated in rule-out drug testing, visitation, or parent aide services, and had not provided proof of employment or stable housing, or shown that he could adequately parent the child and meet his daily needs.

¶11        On November 30, 2015, Father advised the DCS case manager assigned to his case that he would begin travelling to Arizona every other weekend to visit the child. Although the parent aide indicated a willingness to work with Father and consider his travel and work schedule, Father did not participate in a supervised visit until January 23, 2016.

¶12        Father finally submitted to a hair follicle test on February 9, 2016, when he came to Arizona for a pretrial conference. That test was negative for illegal substances. Father then also participated in a second supervised visitation; however, after the second visitation, Father advised the DCS case manager in March 2016 that he no longer had a job and could not afford to come to Arizona to visit the child.

¶13        After Father's negative hair follicle test, the juvenile court ordered an expedited home study in California under the Interstate Compact on the Placement of Children ("ICPC"). DCS sought reconsideration of the order, however, after discovering Father's criminal record and Father's failure to provide DCS with the necessary proof of employment and stable housing. After reviewing Father's criminal history, the juvenile court determined that Father was ineligible for the ICPC process.[8]

¶14        In May 2016, DCS closed Father out of parent aide services and supervised visitation because he had missed too many visits and a

---

[8]        In its severance order, the juvenile court also noted that Father had testified at the severance hearing "that he is currently using marijuana but his [medical] marijuana card expired last month. This may also make him ineligible for a California ICPC." Father maintained he had contacted a previous case manager about the possibility of his parents being the child's placement; however, the current case manager testified that the possibility of an ICPC for the paternal grandparents was not explored because Father had not discussed that with DCS and "the grandparents never contacted [the case manager] to state that they wanted to be [the child's] placement."

psychological consultation indicated that further visits with Father were not in the child's best interest. By that time, the child was more than twenty months old, and Father had visited him only twice.

¶15 At the severance hearing, Father testified he had worked for a call center "for about a month and a half" before being located by DCS, and that he had lost that job after traveling to Arizona for a court hearing. He further testified that he had since done "different side jobs" for the charter school where his mother worked; however, he had yet to provide DCS a copy of any paystub or lease, and he testified that he could not leave his parents' home and independently meet the child's needs until he became "financially stable." He also testified he did not find having a job important to support the child, and as noted, he continued to use marijuana despite not having a valid medical marijuana card.

¶16 The DCS case manager opined that Father had substantially neglected or wilfully refused to remedy the circumstances that had caused the child to be in an out-of-home placement, and explained her concern with placing the child with Father:

> [Father] has failed to show any kind of financial stability. There is no bond between [Father] and his child. Due to the fact that the child is such a young child and [Father] has only had two visits with him, there's no way that he was able to formulate a strong and healthy bond with his father.
>
> At the child's age, he's forming bonds, and he has a significant bond with the individuals that he has in his life now, and to . . . return him to his father would be emotionally devastating to this child.

She further stated that the child was currently placed in an adoptive placement—with the maternal cousin—and that termination would provide the child permanency and stability.

¶17 After taking the matter under advisement, the juvenile court granted DCS's motion to terminate Father's parental rights to the child on the ground of six months' time-in-care. The court also found that severance was in the child's best interest.

¶18 Father filed a timely notice of appeal. We have jurisdiction pursuant to A.R.S. § 8-235(A) (2014) and Rule 103(A) of the Arizona Rules of Procedure for the Juvenile Court.

**ANALYSIS**

*I.    Standard of Review*

**¶19**      A parent possesses a fundamental liberty interest in the care, custody, and management of his child. *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶ 24, 110 P.3d 1013, 1018 (2005) (citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶ 11, 995 P.2d 682, 684 (2000)).  Even fundamental rights are not absolute, however. *Id.* (citing *Michael J.*, 196 Ariz. at 248, ¶ 12, 995 P.2d at 684).  A court may sever those rights if it finds clear and convincing evidence of one of the statutory grounds for severance, and finds by a preponderance of the evidence that severance is in the child's best interest. *See* A.R.S. §§ 8-533(B), -537(B) (2014); *Kent K.*, 210 Ariz. at 281–82, 288, ¶¶ 7, 41, 110 P.3d at 1015–16, 1022.

**¶20**      The juvenile court retains great discretion in weighing and balancing the interests of the child, parent, and state. *Cochise Cty. Juv. Action No. 5666-J*, 133 Ariz. 157, 160, 650 P.2d 459, 462 (1982).  As the trier of fact in a termination proceeding, the court "is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and resolve disputed facts." *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18, 219 P.3d 296, 303 (App. 2009) (quoting *Ariz. Dep't of Econ. Sec. v. Oscar O.*, 209 Ariz. 332, 334, ¶ 4, 100 P.3d 943, 945 (App. 2004)).  Thus, the resolution of conflicts in the evidence is uniquely the province of the juvenile court, and we will not reweigh the evidence in our review. *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 282, ¶ 12, 53 P.3d 203, 207 (App. 2002); *see also Pima Cty. Adoption of B-6355*, 118 Ariz. 111, 115, 575 P.2d 310, 314 (1978) ("In considering the evidence it is well settled that an appellate court will not substitute its own opinion for that of the trial court." (citation omitted)).

**¶21**      We will not disturb the juvenile court's order absent an abuse of discretion or unless no reasonable evidence supports its factual findings. *Matthew L.*, 223 Ariz. at 549, ¶ 7, 225 P.3d at 606; *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8, 83 P.3d 43, 47 (App. 2004).  In reviewing the juvenile court's decision to terminate parental rights, we review *de novo* questions of law and the court's legal determinations, including the application of a statute or rule. *See Manuel M. v. Ariz. Dep't of Econ. Sec.*, 218 Ariz. 205, 210, ¶ 18, 181 P.3d 1126, 1131 (App. 2008); *Ariz. Dep't of Econ. Sec. v. Ciana H.*, 191 Ariz. 339, 341-42, 955 P.2d 977, 979-80 (App. 1998); *Maricopa Cty. Juv. Action No. JV-507879*, 181 Ariz. 246, 247, 889 P.2d 39, 40 (App. 1995).

*II.    Father's Arguments Regarding Severance*

¶22        Father argues that the juvenile court erred in terminating his parental rights on the ground of six months' time-in-care under A.R.S. § 8-533(B)(8)(b).

¶23        Under § 8-533(B)(8)(b), the juvenile court may terminate parental rights if DCS "has made a diligent effort to provide appropriate reunification services" and

> [t]he child who is under three years of age has been in an out-of-home placement for a cumulative total period of six months or longer pursuant to court order and the parent has substantially neglected or wilfully refused to remedy the circumstances[9] that cause the child to be in an out-of-home placement, including refusal to participate in reunification services offered by [DCS].

The court, moreover, "shall consider the availability of reunification services to the parent and the participation of the parent in these services." A.R.S. § 8-533(D).

¶24        Termination under this ground, however, "is not limited to those who have *completely* neglected or willfully refused to remedy such circumstances." *Maricopa Cty. Juv. Action No. JS-501568*, 177 Ariz. 571, 576, 869 P.2d 1224, 1229 (App. 1994). When a parent makes only sporadic, aborted attempts to remedy such circumstances, the court "is well within its discretion in finding substantial neglect and terminating parental rights on that basis." *Id.*; *see also Donald W. v. Ariz. Dep't of Econ. Sec.*, 215 Ariz. 199, 205-06, ¶ 21, 159 P.3d 65, 71-72 (App. 2007) (concluding that failing to maintain contact with DCS and participate in visitation supported a "substantial neglect or willful refusal" finding).

¶25        DCS makes a diligent effort to provide appropriate reunification services when it provides the parent "with the time and opportunity to participate in programs designed to help [him] to become an effective parent." *Christina G. v. Ariz. Dep't of Econ. Sec.*, 227 Ariz. 231, 235, ¶ 14, 256 P.3d 628, 632 (App. 2011) (quoting *Maricopa Cty. Juv. Action No. JS-501904*, 180 Ariz. 348, 353, 884 P.2d 234, 239 (App. 1994)). DCS "is

---

9        Such circumstances are those "existing at the time of the severance rather than at the time of the initial dependency petition." *Maricopa Cty. Juv. Action No. JS-8441*, 175 Ariz. 463, 468, 857 P.2d 1317, 1322 (App. 1993), *abrogated on other grounds by Kent K.*, 210 Ariz. at 282, ¶ 12, 110 P.3d at 1016.

not required, however, 'to provide every conceivable service or to ensure that a parent participates in each service it offers.'" *Id.* (quoting *JS-501904*, 180 Ariz. at 353, 884 P.2d at 239). Nor must DCS undertake futile rehabilitative measures; instead, DCS must undertake measures that have a reasonable prospect of success. *Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34, 971 P.2d 1046, 1053 (App. 1999). Moreover, DCS need not undertake such measures indefinitely. *See JS-501568*, 177 Ariz. at 577, 869 P.2d at 1230. The legislature's purpose in enacting § 8-533(B) "was to give children who are placed outside the home the opportunity to bond with stable parents after a reasonable period of time, instead of being shuttled from one foster family to the next for as long as it takes their biological parents to assume their responsibilities." *Id.* (citation omitted).

**¶26** In this case, reasonable evidence supports the juvenile court's conclusion that DCS made a diligent effort to provide Father appropriate reunification services and that Father substantially neglected or wilfully refused to remedy the circumstances that caused the child's out-of-home placement.

**¶27** Shortly after the dependency commenced in January 2015, DCS located Father,[10] advised him to establish paternity of the child, and referred him multiple times for a paternity test. Nonetheless, Father missed the first three tests set up for him and maintained minimal contact with DCS before taking the test—more than four months later. DCS advised Father that before he could unite with the child, he would need to provide a negative rule-out drug test, comply with any services, regularly contact the child, and show proof of stable employment and housing; however, Father missed seven scheduled urinalysis tests before finally submitting to a hair follicle test in February 2016—more than a year after the dependency began and several months after DCS had moved to terminate Father's parental rights. Moreover, although offered visitation through a parent aide, Father only visited the child twice during the dependency—despite the fact that he appeared for hearings in the case, advised the case manager he would visit every other week, and was offered flexibility in arranging visits—until a physchological consult approximately three months before the severance hearing indicated such visits no longer served the child's best interest.

---

[10] Father argues that he "did not have anything to do with the 'circumstances that cause[d M.N.] to be in an out-of-home placement.'" DCS maintained, however, that despite several attempts, it had been unable to contact Father until the parent-locate service found him after the dependency was filed.

Further, although DCS prepared an ICPC packet for a home study in California, DCS could not submit it due to Father's criminal history and failure to provide proof of employment and housing.[11]

¶28    Father, however, argues that DCS did not make a diligent effort to provide appropriate reunification services because DCS "disregarded the [Arizona Supreme Court] Foster Care Review Board's [("FCRB")'s] directive" to offer Father visits with the child.  Father's argument stems from the fact that, in late May 2016, Father attended a meeting of the FCRB, after which the FCRB recommended that DCS offer Father visits with the child.  After considering the FCRB's recommendation, however, DCS did not alter its decision to halt Father's visitation.

¶29    We find no error.  The FCRB's decision was a recommendation, not a directive.  Moreover, the FCRB was apparently not informed that, by the time it made its recommendation, DCS had already offered Father visits for nearly a year and Father had visited the child just twice—after DCS had moved to terminate Father's parental rights.  The FCRB was also apparently not informed that the psychologist who consulted with DCS had already concluded that such visits no longer served the child's best interest, and that DCS had stopped such visits based on that conclusion.  *See Mary Ellen C.*, 193 Ariz. at 192, ¶ 37, 971 P.2d at 1053 (emphasizing the importance that DCS consider consulting experts' recommendations).

¶30    Father also asserts that he asked DCS to help him attend visits with the child "[b]ut, rather than assist, [DCS] threatened Father:  either come out every two weeks, or we'll suspend your visitation."  The juvenile court, however, was not bound to accept as true Father's testimony about DCS's alleged threat.  *See Aries v. Palmer Johnson, Inc.*, 153 Ariz. 250, 261, 735

---

[11]    Although Father argues that DCS's requirement that he provide DCS with a lease or other proof of stable housing is "devoid of any common sense" because he lives with his parents, the record is unclear of the extent to which Father advised DCS of his living arrangements.  When asked if she was "aware of who [F]ather is currently living with," the case manager initially testified she was not.  Later, on cross-examination, she stated, "I believe he lives with his parents; however, I cannot be positive on that."

P.2d 1373, 1384 (App. 1987).[12] Moreover, the evidence does not support that testimony, because DCS did not terminate Father's visits with the child until May 2016—after DCS consulted with the psychologist who recommended terminating visitation.[13] The record instead supports the conclusion that Father chose to stay in California and effectively ignore the child throughout the dependency.

¶31         Accordingly, reasonable evidence supports the court's findings that severance under the statutory ground of six months' time-in-care is supported by clear and convincing evidence and that DCS made a diligent effort to provide appropriate reunification services.

     III.     *Best Interest*

¶32         Father does not challenge the juvenile court's finding that severance was in the child's best interest; however, we note that the record supports the finding.

¶33         At the time of the severance hearing, Father had not shown financial stability or the ability to establish a bond with the child. Moreover, the child is adoptable and was placed with the maternal cousin, a prospective adoptive placement. *See Oscar O.*, 209 Ariz. at 334, ¶ 6, 100 P.3d at 945; *Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 377, ¶ 5, 982 P.2d 1290, 1291 (App. 1998). The record also indicates the child's placement is meeting his physical, psychological, and emotional needs. *See Audra T.*, 194 Ariz. at 377, ¶ 5, 982 P.2d at 1291. Further, the record demonstrates the affirmative benefits of permanency and stability available to the child from severance. *See generally Maricopa Cty. Juv. Action No. JS–500274*, 167 Ariz. 1, 6-7, 804 P.2d 730, 735-36 (1990).

---

[12]     Nor was the juvenile court bound to accept as true Father's testimony that the child's sister was thriving in Father's care. *See Aries*, 153 Ariz. at 261, 735 P.2d at 1384.

[13]     Father had already informed DCS that he could no longer afford to travel to Arizona to visit the child in March 2016, although he attended the pretrial conference in Arizona a month later—in April 2016.

## CONCLUSION

¶**34** The juvenile court's order terminating Father's parental rights to the child is affirmed.



AMY M. WOOD • Clerk of the Court
FILED: AA