SERVICIOS COMERCIALES ANDINOS, S.A., Plaintiff—Appellee,

v.

GENERAL ELECTRIC DEL CARIBE, INC., Defendant—Appellant.

No. 96–2352.

United States Court of Appeals, First Circuit.

Heard Nov. 6, 1997.

Decided June 12, 1998.

Gordon T. Walker, with whom Heidi A. Chesley and McDermott, Will & Emery were on brief for appellant.

Edward M. Borges, with whom Luis Edwin González–Ortiz and O'Neill & Borges were on brief for appellee.

Before TORRUELLA, Chief Judge, CYR, Senior Circuit Judge, and PIERAS, * Senior District Judge.

TORRUELLA, Chief Judge.

This appeal revolves around a breach of contract claim governed by Peruvian law. Defendant General Electric del Caribe, Inc. ("GE del Caribe") appeals from the Septem-

---

\* Of the District of Puerto Rico, sitting by designa- tion.

ber 20, 1996, judgment of the district court finding it liable for the breach of a contract to purchase 1,000 metric tons of Pima cotton from the plaintiff, Servicios Comerciales Andinos, S.A. ("SECOMAN"), a Peruvian partnership. Following a bench trial, the district court found for SECOMAN, awarded damages for loss of profits caused by the breach, and ordered GE del Caribe to pay a portion of SECOMAN's attorneys' fees as a sanction under P.R. R. Civ. P. 44.1 for its obstinate conduct during litigation. GE del Caribe appeals the finding of breach, the determination of damages, and the imposition of sanctions. We affirm in part and reverse in part.

## I. *Background*

We recite the facts in the light most favorable to the district court's findings of fact. *See Wainwright Bank & Trust Co. v. Boulos,* 89 F.3d 17, 18 (1st Cir.1996).

SECOMAN had been engaged in the purchase and resale of Tanguis cotton since its founding in 1977. Until 1989, SECOMAN was licensed to sell cotton only inside Peru. At that time, SECOMAN attempted to enter the international cotton market, first by obtaining a license to export cotton from Peru, and then by entering into a joint venture with another Peruvian business to buy cotton and resell it on the international market. The joint venture focused on Pima rather than Tanguis cotton because Pima cotton is of higher quality and is generally in greater demand. Moreover, at the time there was a substantial differential between the price at which Pima cotton could be purchased from cotton producers in Peru and the international market price. In order to build a stock of cotton for export, SECOMAN obtained lines of credit, totaling $2,000,000, from various Peruvian banks. In the fall of 1989, SECOMAN began to purchase Pima cotton.

GE del Caribe, a corporation organized under the laws of Puerto Rico, is a subsidiary of the GE Supply Company, based in Connecticut, which is in turn a division of the General Electric Company. As its name suggests, GE del Caribe is engaged in the sale of General Electric products in the Caribbean, Central America, and South America. Mr. Enrique Aranda, a Peruvian national, was the president of GE del Caribe from 1986 to 1993. In 1990, he was trying to increase his company's sales by penetrating different Latin American markets.

In early 1990, Mr. Aranda spoke with a friend in Peru, Mr. Huertas del Pino, who was the president of Carmel Export Agency, Inc. ("Carmel"), and who informed him that through his contacts there, he could facilitate GE del Caribe's expansion into that market. In particular, Mr. Huertas had a business relationship with Horizon Trading, Inc. ("Horizon"), a Peruvian entity established in the Cayman Islands and engaged in the export of Peruvian products.

Around the same time, Horizon was informed that there was a seller on the market ready to provide 1,000 tons of Pima cotton for sale at $1.70 per pound, and that the seller was willing to pay a commission on the sale. Horizon communicated this information, as well as the fact that the international price for Pima cotton was $2.40 per pound, to Mr. Huertas, who replied that he believed that he could find a buyer.

That person was Mr. Aranda. Mr. Huertas arranged for a meeting to take place in Peru between Mr. Aranda and several Peruvian businessmen who were interested in exporting cotton and other Peruvian products. In preparation for the meeting, Mr. Aranda requested that both Mr. Huertas and a GE del Caribe employee provide him with information regarding the cotton market. He received samples of SECOMAN's Pima cotton, and began to research the possibility of reselling the cotton abroad.

The meeting was held on Friday, March 23, 1990, at the Caesar's Palace Hotel in Lima, Peru. Among those present was Mr. Alfredo Gordillo, general manager and 90% owner of SECOMAN. At the meeting, Mr. Aranda told Mr. Gordillo that he was interested in purchasing the cotton that SECOMAN had in stock. Although Mr. Gordillo was offering only 600 tons, when asked whether he could supply more he stated that he could export up to a total of 1,000 tons, at $1.72 per pound. After the meeting, Mr. Aranda called Mr. Gordillo and insisted that

the two of them meet again the following day to discuss the transaction.

At the second meeting, held in Mr. Gordillo's office, Mr. Aranda and Mr. Gordillo negotiated the details of an agreement pursuant to which GE del Caribe would purchase 1,000 tons of Pima cotton from SECOMAN. Among other things, Mr. Gordillo agreed to Mr. Aranda's request that the asking price be reduced to $1.58 per pound. Payment was to be made by a negotiable letter of credit, with a face value of $2,800,000, which would be submitted to SECOMAN for its approval. GE del Caribe was also to make an initial deposit of $100,000 in Mr. Gordillo's account in a Miami, Florida bank. As they had discussed the day before, SECOMAN had 600 tons of Pima cotton in stock and ready to ship immediately. Mr. Aranda agreed to allow SECOMAN an additional two weeks to purchase and ship the extra 400 tons.

Mr. Gordillo also asked Mr. Aranda whether he had pre-sold the cotton. Mr. Aranda replied that he had not, but that he had some prospects. Mr. Aranda asked Mr. Gordillo for the names of some of SECOMAN's clients, which Mr. Gordillo agreed to do if Mr. Aranda's prospective buyers did not purchase the cotton. Mr. Gordillo also offered SECOMAN's services as a sales agent for GE del Caribe, given SECOMAN's greater expertise in the cotton market. Mr. Aranda agreed, but only on condition that SECOMAN not offer the same cotton for sale without GE's prior written authorization. Finally, Mr. Gordillo asked Mr. Aranda to have GE del Caribe confirm his authority to enter into the agreement.

Because it was a Saturday, Mr. Gordillo did not have secretarial assistance in the office, and he therefore suggested that the agreement be drafted at a later date. Mr. Aranda stated, however, that he would rather have a document drafted immediately, and then proceeded to type up the substance of their agreements in English in a document entitled "Agreement to Purchase" ("Agreement"). Both of them then signed the Agreement.

Initially, the parties began to perform their respective duties under the Agreement.

Thus, on March 29, 1990, GE's Vice President of Finance sent a letter by facsimile to SECOMAN ratifying the Agreement, indicating that Mr. Aranda was "authorized by GE del Caribe to negotiate and conclude business deals such as the one we have concluded on March 24 with [SECOMAN]." On April 20, 1990, GE del Caribe deposited the agreed-upon $100,000 in Mr. Gordillo's bank account. SECOMAN, in the meantime, began purchasing additional Pima cotton to comply with its duty to provide a total of 1,000 tons of cotton.

Mr. Aranda had also immediately begun to seek buyers for the cotton at $1.90 per pound. However, by April 5, 1990, he had not yet found any buyers, so on that day he wrote to SECOMAN indicating that the sale of the cotton was taking longer than foreseen and requesting an additional eight working days to conclude the sale. At the same time, Mr. Huertas was also negotiating the sale of 1,000 tons of Pima cotton at $1.90 per pound. Mr. Huertas also required the prospective buyer to make a $100,000 deposit. Although Mr. Huertas claimed that it was merely a coincidence that he was offering Pima cotton for sale on the same terms as GE del Caribe, the district court found that Mr. Huertas had no cotton of his own, but was instead helping Mr. Aranda to find a buyer for the cotton that GE del Caribe had purchased from SECOMAN.

Throughout the late spring and early summer of 1990, the international market price for Pima cotton was steadily dropping, dooming Mr. Aranda's efforts to sell the cotton that GE del Caribe had purchased from SECOMAN. For example, on May 14, 1990, Mr. Aranda contacted again a potential purchaser who had offered to buy the cotton at $1.70 per pound, but had originally been turned down because GE del Caribe was asking for $1.90 per pound. Even though Mr. Aranda lowered the sale price to $1.73 per pound, the offeree rejected the offer noting that the world price had dropped even further.

In mid-April, Mr. Aranda began to visit banks in Puerto Rico to obtain the letter of credit that was due under the Agreement.

At that time, he had not yet informed his superiors of his trip to Peru, of the existence of the Agreement, or of his efforts to sell the cotton. The banks, however, would not issue a letter of credit without a guarantee, or "letter of comfort," from GE's parent company. Therefore, in early May, Mr. Aranda sought the assistance of his superiors in GE Supply Co., explaining that GE del Caribe needed the letter of comfort in order to obtain the letter of credit that SECOMAN was to receive pursuant to the Agreement. He also explained that GE del Caribe stood to gain $300,000 on the sale of the cotton.

Mr. Aranda's superiors, however, refused to issue the letter of comfort, instructed him not to comply further with the Agreement, and began to investigate the matter. On May 23, 1990, Mr. James Ambrose, who was the Chairman of the Board of Directors of GE del Caribe as well as an officer in GE Supply, flew to Puerto Rico to discuss the Agreement with Mr. Aranda. Mr. Ambrose expressed his displeasure over the fact that Mr. Aranda had committed GE del Caribe to this transaction without the approval of the Board of Directors. At its next meeting, the Board reprimanded Mr. Aranda for his actions.

The district court concluded that from that point on, GE del Caribe sought ways to shirk its duties under the contract. In particular, after much delay, GE del Caribe sent SECOMAN a *revocable* letter of credit. SECOMAN rejected the proffered letter and requested, instead, a confirmed, irrevocable letter of credit. On June 11, 1990, GE del Caribe wrote to SECOMAN claiming that SECOMAN's rejection of the proffered letters was an essential breach of the contract that entitled GE del Caribe to resolve the Agreement. However, the district court determined that SECOMAN had not breached any obligation in rejecting the revocable letter of credit, since such a letter did not satisfy the requirement, imposed by the Agreement, that GE del Caribe produce a *negotiable* letter of credit because only irrevocable letters of credit can be negotiable. The district court further determined that GE del Caribe's violation of this aspect of the contract was willful and in bad faith,

since it knew that the Agreement required that the letter of credit be irrevocable.

GE del Caribe's initial delay and eventual failure to procure an irrevocable letter of credit not only deprived SECOMAN of its expected profit on the Pima cotton transaction, but also started a chain reaction that devastated SECOMAN's finances. GE del Caribe's failure to tender a negotiable letter of credit rendered SECOMAN unable to meet its obligations under the lines of credit it had opened the year before. SECOMAN was then reported to the Superintendent of Banks and Insurance of Peru for its failure to meet these obligations and placed on a list of defaulting entities. The listing prevented SECOMAN from obtaining any further financing, which in turn prevented SECOMAN from purchasing the additional cotton that it was required to deliver under two different contracts with other parties. Because of its breach of its obligations under these contracts, the buyers filed demands for arbitration against SECOMAN. Awards were entered against SECOMAN in both arbitrations. Thus, in addition to losing its expected profits on those contracts, SECOMAN was ordered to pay damages to the buyers. Finally, the cumulative effect of these losses was to reduce SECOMAN's value as a going concern.

SECOMAN subsequently filed suit against GE del Caribe for breach of contract in the U.S. District Court for the District of Puerto Rico, alleging alienage jurisdiction under 28 U.S.C. § 1332(a)(2). Before trial, the parties stipulated that their dispute was governed by Peruvian law. After an extensive bench trial, the district court determined that GE del Caribe had not only breached the Agreement, but also that it had done so with "dolo" or *dolus*—that is, in bad faith. Under Peruvian contract law, a defendant who breaches a contract in bad faith is liable for all damages proximately caused by the breach, including unforeseeable damages. *See* Código Civil (C. Civ.) art. 1321 (Peru). Accordingly, the district court's award of damages to SECOMAN included its loss of profits on the sale of cotton to GE del Caribe, as well as all other losses it suffered as a consequence of the breach. Finally, the district court re-

quired GE del Caribe to pay a certain portion of SECOMAN's attorney's fees, as a sanction for GE's obstinate conduct. GE del Caribe then filed the appeal that is now before us.

## II. Standard of Review

■ We review *de novo* a district court's conclusions of law. *See Exxon Corp. v. Esso Workers' Union, Inc.,* 118 F.3d 841, 844 (1st Cir.1997). In this regard, a district court's determination of foreign law "shall be treated as a ruling on a question of law." Fed. R.Civ.P. 44.1. In contrast, "[i]n all actions tried upon the facts without a jury," a district court's "[f]indings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." Fed.R.Civ.P. 52(a); *see La Esperanza De P.R., Inc. v. Pérez Y Cía. De Puerto Rico, Inc.,* 124 F.3d 10 (1st Cir.1997). "We will conclude that a finding is clearly erroneous only when, after reviewing the entire record, we are left with the definite and firm conviction that a mistake has been committed." *Strahan v. Coxe,* 127 F.3d 155, 172 (1st Cir.1997), *petition for cert. filed,* 66 U.S.L.W. 3605 (U.S. Mar. 6, 1998) (No. 97–1485) (citations omitted).

■ Some questions presented to a trial court, however, are neither pure questions of law nor of fact. We review "mixed" questions of law and fact "along a degree-of-deference continuum, ranging from plenary review for law-dominated questions to clear-error review for fact-dominated questions." *Inmates of Suffolk County Jail v. Rouse,* 129 F.3d 649, 661 (1st Cir.1997), *petition for cert. filed,* 66 U.S.L.W. 3531 (U.S. Feb. 4, 1998) (No. 97–1278) (quoting *Johnson v. Watts Regulator Co.,* 63 F.3d 1129, 1132 (1st Cir. 1995)). Thus, "the applicable standard of review varies depending upon the nature of the mixed question; the more fact-dominated it is, the more likely that deferential, clear-error review will obtain, and the more law-dominated it is, the more likely that non-deferential, *de novo* review will obtain." *Sierra Fría Corp. v. Donald J. Evans, P.C.,* 127 F.3d 175, 181 (1st Cir.1997).

■ Contract interpretation often presents mixed questions of law and fact. We thus employ a bifurcated standard in reviewing a district court's interpretation of a contract. *See Boston Car Co., Inc. v. Acura Auto. Div., American Honda Motor Co., Inc.,* 971 F.2d 811, 815 (1st Cir.1992). On the one hand, "it is for the court to determine whether the terms of an integrated agreement are unambiguous and, if so, to construe them according to their plain meaning." *United States Liab. Ins. Co. v. Selman,* 70 F.3d 684, 687 (1st Cir.1995). Appellate review of such determinations is, accordingly, *de novo. See id.* On the other hand, "when the district court's answers rest not on plain meaning but on differential findings by the trier of fact, derived from extrinsic evidence as to the parties' intent with regard to an uncertain contract provision, appellate review proceeds under the 'clearly erroneous' standard." *Id.; see also ICC v. Holmes Transp. Inc.,* 983 F.2d 1122, 1126 (1st Cir.1993); *Gel Systems, Inc. v. Hyundai Engineering & Const. Co.,* 902 F.2d 1024, 1027 (1st Cir.1990).

## III. Analysis

### A. Breach of Contract

GE del Caribe contends that the district court erred in determining that it breached its obligations under the "Agreement to Purchase," for the simple reason that the Agreement was not a final and binding contract under the law of Peru. In support of its claim, GE del Caribe points out three different flaws in the Agreement that arguably prevent it from being a binding contract. First, GE del Caribe claims that the Agreement fails to comply with C. Civ. art. 1359, which provides that "[n]o contract exists as long as the parties do not agree with all of its stipulations, even if the discrepancy is secondary," because the Agreement lacks an undertaking to purchase, a price term, a delivery term, and an agreement on the terms for the letter of credit. Second, GE del Caribe contends that the district court's reliance on evidence extrinsic to the Agreement, particularly in determining that the Agreement's "facilitation" clause contained a drafting error, was *ultra vires* because, un-

der Peruvian law, a court may not use extrinsic evidence to interpret a contract, let alone to rewrite its clear and unambiguous terms. Third, and finally, GE del Caribe asserts that the district court erred in rejecting GE del Caribe's argument that the Agreement was invalid because its purpose was unlawful.

### 1. Conclusions of Law

In its first two arguments, GE del Caribe implicitly contends that the district court erred both by failing to apply correctly the rules of contractual hermeneutics required by the Peruvian Civil Code, and by finding ambiguity in the terms of the contract when there was none. However, GE del Caribe's arguments are also based in part on claims that the district court misapprehended the evidence. As we discussed above, we review *de novo* the district court's determinations of Peruvian law and of the ambiguousness of the terms of the Agreement, but we review the court's findings of fact only for clear error. For the sake of clarity and convenience, we first address the questions of law and of contractual hermeneutics, and only then pass on to evaluate the district court's findings of fact.

### a. Terms of the Agreement

GE del Caribe's first argument begins with the claim that C. Civ. art. 1359 establishes that there can be no contract if the parties have not reached an agreement as to every element of the contract, whether primary or secondary. This assumes that a *lack* of agreement as to *any* contractual terms, as opposed to a *dis*agreement, is enough to prevent a contract from arising. Contending that the Agreement lacked an undertaking to purchase and reflected no agreement on price, date of delivery, or the essential terms of the letter of credit, GE del Caribe concludes that there was no contract.

GE del Caribe's argument is subtly but seriously flawed. The fundamental problem is that, contrary to GE's assertions, Article 1359 does not require the affirmative agreement of the parties as to each and every term of a contract. Instead, Article 1359 distinguishes between essential and non-essential terms, requiring affirmative agreement as to essential terms, but merely requiring that there be no disagreement as to non-essential terms. *See* Manuel de la Puente y Lavalle, *El Contrato en General* [*Contracts in General*], Pt. 1, Tome 1, at 397–98 (Lima, Peru 1993).[1]

Silence as to an essential term is fatal; that is to say, there can be no contract unless the parties have affirmatively agreed to the essential terms of the contract. The crucial problem is determining which terms are essential and which are not. As one commentator has noted, some terms are objectively essential, while others are only subjectively essential. *See id.* at 392. Objectively essential terms are those elements of a contract that are made necessary by the very nature of the contract, without regard to the parties' subjective intent. *See id.* Of course, the difficulty of the task of determining which elements are objectively essential depends on the type of contract involved:

> Notwithstanding that it is relatively difficult to establish, as a general rule, just which are the essential terms of each [type of] contract, the task is easier when it involves those types of contracts that are defined by law, such as the contracts [ ] defined in the Peruvian Civil Code.... Thus, for example, insofar as Article 1529 of the Code defines the contract of sale as the contract whereby a seller binds himself to transfer the ownership of a good to a buyer, and the latter to pay a price in money, the essential terms of that contract are the *good* and the *price*. ... The problem is more delicate with regard to atypical contracts, in which, because of a lack of [legislative] definition, it is hardly possible to determine which contractual obligations are essential and which are secondary.... [I]t is therefore necessary to analyze, case by case, the business purpose of the contract so as to determine which obligations

---

1. The cited work is Volume IX of a collection entitled *Para Leer el Código Civil* [*In Order to Read the Civil Code*], published by the Editorial Fund of the Pontifical Catholic University of Peru. All quotations from this text, as well as from the other cited Peruvian legal texts, are our own translations.

are indispensable for its success: such obligations will constitute the essential elements of the contract.

M. de la Puente y Lavalle, *El Contrato en General* [*Contracts in General*], Pt. 1, Tome 1, at 392 (emphasis supplied). Subjectively essential terms, in contrast, are those which, even though they are not objectively essential, are deemed to be essential by the contracting parties. *See id.* For example, although a delivery term is not objectively essential to a contract of sale (for reasons discussed below), the parties to such a contract may very well consider these essential to the negotiations. The question whether a particular term is subjectively essential presents a issue of fact.

Silence with regard to non-essential terms, in contrast, is not fatal because the Civil Code's norms regarding contracts "are suppletory to the will of the parties, save for those that are imperative." C. Civ. art. 1356. Article 1356 must be read in conjunction with C. Civ. art. 1354, which, in stating that "[t]he parties may freely determine the content of a contract, so long as it is not contrary to any imperative legal norms," establishes a distinction between the imperative and optional provisions of the Civil Code. Optional norms are presumed to apply to a given contract, but parties may elect otherwise, whereas the parties may not opt out of imperative norms.[2] Stated differently, a contract is subject to all imperative norms, as well as any optional norms not excluded by the parties.

Thus, the parties' silence as to any non-essential term is not fatal under Article 1359 because the Code's optional norms provide the missing terms. In contrast, if rather than silence we find disagreement as to any such term, then there can be no contract, because the fact that there is a dispute over a given term rebuts the presumption that the parties would consent to the incorporation of the Code's suppletory norms.

As noted before, GE del Caribe claims that the Agreement to purchase was not a contract because it lacked an undertaking to purchase, a price term, a delivery term, and an agreement on the terms for the letter of credit. The claim fails, for a variety of reasons. With regard to the two essential terms that GE del Caribe contends were missing, these were found by the district court to be present. For example, the alleged lack of an explicit undertaking to purchase is irrelevant because the district court found that such an undertaking was implicit in the Agreement. Similarly, the district court found that the line in the Agreement stating "Cost offered per pound: $1.58 USD" was an explicit price term.

■ The lack of an explicit agreement on the time and place of delivery does not prevent a contract from arising in this case. The delivery term is not objectively essential to a contract of sale because C. Civ. arts. 1552 and 1553 provide default rules governing the time and place of delivery.[3] Moreover, there is no evidence on the record that the delivery term was subjectively essential, and articles 1552 and 1553 are not excluded either explicitly or implicitly by the terms of the Agreement to Purchase. Consequently, these provisions are applicable to this contract.

■ Finally, the argument based on the letter of credit is also unconvincing. The method of payment is not an objectively essential term of a contract of sale. Moreover, although the parties to a sales contract could consider the method of payment to be subjectively essential, there is no indication that such was the case here. In particular, re-

---

2. For example, Article 1403's requirement that a contract must have a legitimate purpose is an imperative norm because it admits of no exceptions, while Article 1552, which states that the object of a sale must be delivered immediately after the contract of sale has been executed, is an optional norm because the parties may provide for a different time of delivery. *See generally* M. de la Puente y Lavalle, *El Contrato en General*, Pt. 1, Tome 1, at 275–80.

3. Article 1552 provides that "[t]he good must be delivered immediately after execution of the contract, except for any delay resulting from its nature or otherwise stipulated." Article 1553 provides, in turn, that "[a]bsent a stipulation, the good must be delivered at the place where it is located at the time the contract was executed. If the good were [of] uncertain [quantity], delivery shall be made at the seller's domicile, once it[s] [quantity] has been determined."

viewing the text of the Agreement,[4] we find no stipulation that the content of the letter was to be the *sine qua non* of the Agreement.

The specific content and format of the letter of credit were thus secondary, nonessential terms of the Agreement. As discussed above, only disagreement as to such terms is fatal under Article 1359. The problem here is that the text of the Agreement does not indicate the existence of a disagreement, or even that the parties agreed to leave the specifics of the letter of credit open for future negotiation. Specifically, it is not clear to us that the requirement that a draft of the letter be submitted to SECOMAN for its approval necessarily means that the parties had not already agreed upon the content of the letter. To the contrary, the requirement may very well have been intended merely to allow SECOMAN the opportunity to ensure that the letter of credit was drafted in accordance with the terms already agreed upon. Accordingly, it fell upon GE del Caribe to prove to the district court by a preponderance of the evidence that the parties had agreed to postpone their negotiation over the details of the letter of credit. The district court, however, found that GE del Caribe failed to carry that burden.

### b. Redrafting of the "facilitation" clause and consideration of extrinsic evidence

The clause in question states: "The SELLERS guarantee the following: ... That the SELLERS will use GE del Caribe as facilitators and sales consultants during this transaction. SELLERS will not negotiate sale of the lot aforementioned without the written agreement of GE del Caribe." The district court found that this clause was not consistent with the most natural reading of the rest of the Agreement, which otherwise seemed to be a contract for the sale of cotton. Moreover, SECOMAN presented evidence that the "facilitation" clause had been incorrectly drafted by Mr. Aranda, because the actual agreement between Mr. Gordillo and himself provided that SECOMAN would act as facilitator and sales consultant for GE del Caribe, not the other way around. The district court believed this evidence, and ruled accordingly.

GE del Caribe claims, however, that Peruvian law prohibits courts from using extrinsic evidence to rewrite the clear and unambiguous terms of an agreement, and therefore that the district court's determination that the Agreement's "facilitation" clause contained a drafting error was *ultra vires*. Although agreeing with the court that the "facilitation" clause was not consistent with the view that the Agreement was a contract of sale, GE del Caribe argues that the clause means what it says, that the court could not ignore the inconsistency, and thus that the only legally permissible conclusion to be drawn from the inconsistency was that the Agreement was not a contract of sale.

GE del Caribe is correct in stating that Peruvian law does not permit a court to rewrite the clear and unambiguous terms of a contract; however, Peruvian law does permit a court to inquire into the common intention of the parties if the terms of the contract are unclear or ambiguous. Contrary to GE del Caribe's assertion, several of the Agreement's provisions are ambiguous and confusing. The source of the problem is evident. GE del Caribe's argument is premised on the erroneous assumption that a contractual provision is ambiguous only when its words are literally unclear. To the contrary, contractual provisions may be ambiguous, even if their words are otherwise clear, if their meaning is placed in question by the context in which they are found.

In order to explain our conclusion, we review some basic concepts of Peruvian contractual hermeneutics. Pursuant to C. Civ. art. 1352, "[c]ontracts are perfected by the consent of the parties, except for those which, in addition, must observe the form required by law under penalty of nullity." Thus, Peruvian law does not require any particular form for contracts, except for certain specific types of contracts that are not

---

4. The Agreement provided, in pertinent part, that "[t]he BUYERS agree to the following: ... They will produce a letter of credit (negotiable) with due diligence," and that "[t]hey will submit to the SELLER a draft of the letter credit for their approval. Specifically on terms and conditions."

relevant here. Instead, the Peruvian Civil Code contains a number of provisions designed to guide the parties (and the courts) in the interpretation of contracts, no matter what their form.

The most basic of these provisions are C. Civ. arts. 168, 169, and 170, which regulate the interpretation of all "juridical acts," including contracts. In particular, Article 168 provides that "[a] legal act must be interpreted in accordance with its content and with the principle of good faith," Article 169 provides that "[a] clause in a legal act is interpreted in the light of the other clauses, and those clauses which are dubious are ascribed the meaning arising from the whole," and Article 170 provides that "[s]tatements that have several meanings must be understood to have the meaning that is most suitable to the nature and object of the legal act." In addition, there are a number of hermeneutic rules that are specifically applicable to contracts. For example, C. Civ. art. 1361 provides that "[c]ontracts are binding as to what is expressed in them. It is presumed that the statements expressed in a contract reflect the common will of the parties, and whomever denies [that the statements do reflect the common will] must prove it." Moreover, C. Civ. art. 1362 emphasizes that "[c]ontracts must be negotiated, executed, and performed according to the rules of good faith and the common intent of the parties." The principle of good faith has been interpreted to imply, among other things, the principle of conservation of contracts, which requires that contracts be interpreted whenever possible in such a way as to preserve their validity. *See* Manuel Miranda–Canales, *Derecho de los Contratos* [*The Law of Contracts* ], at 33–34 (Lima, Peru 1986).

As GE del Caribe correctly states, the theory underlying these provisions is known as the objectivist theory of interpretation. *See* Fernando Vidal–Ramírez, *Tratado de Derecho Civil* [*Treatise on Civil Law* ], Tome III, Vol. I, at 395 (Lima, Peru 1990); *see generally* M. de la Puente y Lavalle, *El Contrato en General*, Pt. 1, Tome 1, at 121–52 (from which much of the following discus-

sion is derived). However, GE's interpretation of the objectivist approach is incorrect. As noted above, although under Peruvian law a contract is perfected by the consent of the parties, *see* C. Civ. art. 1352, consent as a mere subjective mental state has no legal effect. Instead, some outward sign of consent, some declaration of the common will of the parties is required. Unfortunately, the possibility then arises that the declaration of will may not accurately reflect the subjective common will of the parties.

Various theories have been developed in order to resolve the problems that may be caused by this discrepancy. The two most influential theories, the subjectivist and the objectivist, seem also to be diametrically opposed to each other. The subjectivist theory requires the parties to subjectively consent to the contract, and treats the declaration of will merely as evidence of the subjective will of the parties. In contrast, pursuant to the pure version of the objectivist theory, the declaration of will prevails over the subjective common will of the parties, so that if the declaration appears to indicate that the parties consented to the contract, the contract will be upheld even if the parties had not, in fact, had the requisite subjective intent.

Although GE del Caribe claims that Peru has adopted the "pure" version of the objectivist theory, that is clearly not the case. To the contrary, the provisions of the Peruvian Civil Code reflect a less strict version of the objectivist theory, sometimes referred to as the "reliance" theory. *See* M. de la Puente y Lavalle, *El Contrato en General*, Pt. 1, Tome 1, at 149–51 (describing the "teoría de la confianza"); *see also* Vidal–Ramírez, *Tratado de Derecho Civil*, at 374–78. In particular, Article 1361 establishes only a rebuttable presumption that the declaration expressed in the contract reflects the common will of the parties. "This approach conserves the benefits of the [objectivist] system, and, in particular, its security, but it also leaves the way open for the interpreter to determine the subjective intent of the declarant," which furnishes evidence of the common will of the parties. *Id.*[5]

---

5. Notwithstanding the similarities, the "reliance" theory is not another name for the subjectivist theory. One major difference is that the interpretive task is subject to the principle of good

Thus, notwithstanding GE del Caribe's arguments to the contrary, it is simply not true that Peruvian law bars courts from considering evidence extrinsic to the text of an ambiguous or unclear contract. A contract is interpreted as a whole (not as a series of disjointed, independent clauses), and in light of its nature and purpose. *See* C. Civ. arts. 169, 170. Consequently, when an individual clause appears to be inconsistent with the others and with the purpose of the contract, a court is empowered to inquire further into the common will of the parties. In doing so, the court operates under a presumption that the text of the clause in question reflects the common will of the parties, but the presumption may be rebutted by evidence to the contrary as to the common will of the parties. *See* C. Civ. art. 1361. *A fortiori*, that evidence can only be evidence that is extrinsic to the contract. If the evidence is sufficient to rebut the Article 1361 presumption, the court may enforce the terms of the contract as it finds that they were agreed to, rather than as they were written. *See* Lavalle–Zago, *Contratos* at 197–98.

With regard to the case at hand, we agree with the district court's conclusion that the "facilitation" clause was not consistent with the rest of the contract. The contract was entitled "Agreement to Purchase," and labeled the parties as "BUYERS" and "SELLERS." Most of the other clauses in the contract were consistent with the interpretation that the Agreement was, in fact, a contract for the sale of cotton. The first sentence in the facilitation clause, however, indicates that SECOMAN is to use GE del Caribe as a facilitator and sales consultant, which, as both parties agree, is difficult to reconcile with the view that the Agreement is a sales contract.

There are at least two alternative interpretations of this discrepancy, the one advocated by SECOMAN and adopted by the district court, and the one espoused by GE del Caribe. As one commentator has noted with

regard to Article 168, courts are not required to interpret words literally, "when such an interpretation would lead to [an] absurd [result] or to contradiction." LavalleZago, *Contratos* at 194. In this case, both parties' interpretations may lead to internal contradictions: SECOMAN's interpretation appears to be contradicted by the first sentence of the facilitation clause, while GE del Caribe's interpretation appears to be contradicted by the title of the Agreement and the nomenclature of the parties used therein.

Regardless of which interpretation is correct, we find that the meaning of the facilitation clause was sufficiently contentious to make it necessary for the district court to receive any evidence that was probative of the common will of the parties. In this regard, we find no merit in GE del Caribe's claim that the subsequent conduct of the parties may not be used by a court in interpreting a contract. To the contrary, when the meaning of a contract is unclear, "the entire behavior of the parties must be observed, before, during, and even after the conclusion of the contract." Max Arias–Schreiber, *Código Civil Peruano de 1984* [*Peruvian Civil Code of 1984*], Tome I, at 89–90 (Lima, Peru 1986).

## 2. Findings of Fact

A single reading of the Agreement suggests that the parties intended to enter into some sort of binding contract. As noted before, the Agreement was entitled "Agreement to Purchase," labeled the parties "BUYERS" and "SELLERS," indicated the price and quantity of the cotton being offered, expressed the parties' various guarantees and obligations in imperative language, and was signed by the President and Managing Director of GE del Caribe and SECOMAN, respectively. At first blush, the Agreement appears to be a contract for the sale of cotton.

faith, embodied in Articles 168 and 1362, which implicitly recognizes the difficulty in determining the subjective intent of the parties. The principle of good faith thus legitimizes the interpreter's reasonable reliance on the declaration of will as a guide to the parties' common will. Another

important difference is that the evidence that may be used to rebut the presumption established by Article 1362 is evidence of the *common* will of the parties, as opposed to each side's own subjective intent.

Upon examining the Agreement more closely, however, that initial impression is placed in doubt. For example, the first sentence of the Agreement states that the parties are agreeing to "initiate this agreement to purchase," which could lead one to question whether the Agreement was merely designed to pave the way to further negotiations. Similarly, the Agreement does not literally state that the sellers will sell the cotton, or that the buyers will buy it. Instead, the Agreement indicates that "[t]he SELLERS guarantee ... [t]hat they have available to sell a total of 1000 metric tons of PIMA cotton," and that "[t]he BUYERS agree ... that they will produce a letter of credit (negotiable) with due diligence." On the basis of the text alone, it is not possible to establish with certainty that the Agreement contemplates the immediate sale of cotton to GE del Caribe. Moreover, as we have discussed above, it is very difficult to reconcile the text of the facilitation clause with the view that the Agreement is a contract for the sale of cotton.

■ The district court was faced with the task of making sense of this unclear text. GE del Caribe contends that, upon determining that the text alone was insufficient to establish the existence of a contract of sale, the court should have ruled that there was no contract. As we have explained, however, when a court is faced with a text such as this, the principle of conservation of contracts directs the court to look beyond the four corners of the contract for evidence of the common will of the parties. After all, one conclusion that can be drawn with confidence from the text itself is that the parties intended the Agreement to be binding. As GE del Caribe correctly points out, that does not necessarily mean that the Agreement is a binding contract, because the terms of the Agreement must comply with the requirements established by Peruvian contract law. It does, however, mean that the court may presume that the Agreement is a contract,

and therefore investigate further to determine what the specific terms of the contract might be. During such an inquiry, moreover, the party claiming that the Agreement is not a contract bears the burden of proof. *See* C. Civ. art. 1361.[6]

■ After reviewing the evidence that the district court had before it, we conclude that its finding that the Agreement to Purchase was a binding contract for the sale of cotton was not clearly erroneous. First, there is substantial evidence indicating that both SECOMAN and GE del Caribe perceived themselves to be bound by the Agreement and acted accordingly. Indeed, it would be difficult to characterize the evidence that GE del Caribe deposited $100,000 in Mr. Gordillo's bank account, or that Mr. Aranda made a substantial effort to obtain a confirmed letter of credit, as indicating anything but that the parties perceived the Agreement to be binding. In addition, GE del Caribe sent SECOMAN a fax ratifying the Agreement, stating that Mr. Aranda "is authorized by GE del Caribe to negotiate and conclude business deals *such as the one we have concluded* on March 24 with your company." (Emphasis supplied). GE del Caribe's decision to send SECOMAN a letter of credit, albeit one that did not comply with the Agreement, also tends to undermine the claim that it did not consider the Agreement to have any binding force.

Second, the conclusion that the contract was specifically one for the sale of cotton is supported by the text of the Agreement and by the testimony of the plaintiffs and their legal experts, which the district court found credible.[7] For example, we perceive no error in the district court's determination that the clause stating that the "[c]ost offered per pound: $1.58 USD" provided the sale price, or in the finding that the reference to 1000 tons of cotton being available indicated that the quantity of cotton sold was 1000 tons. The court heard testimony indicating that

---

6. During trial, therefore, GE del Caribe bore the burden of proving that the Agreement was an incomplete, and consequently non-binding, contract. Conversely, SECOMAN bore the burden of proving that the "facilitation" clause had been mis-drafted.

7. Although pursuant to Fed.R.Civ.P. 44.1, the testimony of foreign legal experts is generally admissible for the purpose of assisting the court in its determination of foreign law, the finder of fact is entitled to make its own assessment of the credibility of such experts.

these price and quantity terms were the terms of SECOMAN's offer, and that GE del Caribe accepted the offer by signing the Agreement. The fact that the Agreement uses the terms "cost offered" and "availability" rather than "price for sale" and "quantity sold" does not necessarily imply that the Agreement was not a contract of sale. Moreover, the Agreement was typewritten by a non-lawyer who, to judge from the fact that he could not wait until the following working day, was apparently in a hurry to close the deal. We thus find that there was sufficient evidence before the court to allow it to conclude that the Agreement contained price and quantity terms.

Similarly, the findings as to the delivery term are perfectly consistent with the Civil Code's default provisions. *See* C. Civ. arts. 1552, 1553. In particular, the Code provides that, absent a stipulation to the contrary, a good is delivered by making available to the buyer at the place where it is located. *See* C. Civ. art. 1553. Accordingly, SECOMAN's agreement to make the cotton available and ready to ship was sufficient to comply with its contractual obligation to deliver the cotton.

The district court also heard testimony indicating that Mr. Aranda had mis-drafted the facilitation clause, erroneously transposing the names of GE del Caribe and SECOMAN. GE del Caribe argues that such testimony was inherently unreliable, since the resulting clause would be internally inconsistent. We disagree. The resulting clause would read as follows:

> That GE del Caribe will use SELLERS as facilitators and sales consultants during this transaction. SELLERS will not negotiate sale of the lot aforementioned without the written agreement of GE del Caribe.

The district court's reading is not implausible. Indeed, far from being internally incoherent, the resulting clause is consistent with a contract whereby SECOMAN sells cotton to GE del Caribe, which then resells the cotton. According to the district court's understanding of this aspect of the Agreement, although Mr. Aranda had some potential buyers in mind, SECOMAN agreed to assist GE del Caribe in its efforts to resell the cotton because of its greater expertise in the cotton market. GE del Caribe, however, retained final authority to approve or reject any offer from a potential buyer. Given the evidence heard at trial, we cannot say that it was clear error for the district court to find that this was the deal agreed to by Mr. Aranda and Mr. Gordillo.

Furthermore, it was not clear error for the district court to find that the Agreement required GE del Caribe to submit a confirmed letter of credit, based on evidence that, as a matter of customary practice in international trade and finance, a letter of credit will not be treated as negotiable unless it is confirmed by a bank. Based on this evidence, as well as on evidence that GE's policy is never to accept an unconfirmed letter of credit because it is not negotiable, the court also found that GE del Caribe knew of this customary practice and thus knew that the Agreement required the letter of credit to be confirmed. We find the evidence sufficient to support the court's conclusions.

In sum, GE del Caribe failed to show that the Agreement was not a sales contract. Although GE del Caribe presented some evidence to the contrary, the evidence on SECOMAN's side was not so unreliable as to make it unreasonable for the district court to give it credit. Moreover, although GE del Caribe has focused on arguing that the Agreement was not a binding contract, it has also hinted that the Agreement might have been binding after all, but only as part of a multilateral barter trade agreement, rather than as a simple contract of sale.[8] Admitted-

---

8. The evidence showed that barter trade agreements are commonly utilized by multi-national companies, such as GE Trading Co. (GE del Caribe's sister company), to support their overseas sales, particularly to countries with high rates of inflation or with unfavorable currency conversion rates, by guaranteeing payment in dollars rather than in local currency. The structure of these transactions is fairly uniform. A multi-national company (A) sells certain products to an overseas customer (B), but, instead of receiving payment in the customer's national currency, the customer turns the payment over to a third company (C), which is located in the same country but is engaged in the export business. In exchange for the transfer of funds in national

ly, GE del Caribe's proposed interpretation of the Agreement is plausible, but it is not our province to make findings of fact. More importantly, even if the Agreement had been a barter trade contract, GE del Caribe failed to show that it would not have required GE del Caribe to produce the letter of credit. Given that SECOMAN's cause of action arises out of GE's willful failure to produce a negotiable letter of credit, it is unclear whether GE's proposed reading of the Agreement would lead to a different result in this case.

Finally, we address GE del Caribe's argument that the Agreement was invalid because its purpose was unlawful. Article 1403 of the Civil Code provides that the "obligation that is the object of the contract must be legitimate." We agree that under Peruvian law, a contract for an unlawful purpose is void. However, as GE del Caribe admits, nothing on the face of the Agreement indicates that the Agreement had an illegal purpose. Instead, GE del Caribe's argument is based on the plaintiff's testimony indicating that SECOMAN requested payment in the form of a letter of credit so that it could circumvent Peru's foreign exchange and tax laws. GE del Caribe specifically claims that SECOMAN violated a Peruvian law that requires exporters to deposit any proceeds from their sales abroad in the government-owned Central Bank, which converts the proceeds to Peruvian currency at a rate that is usually less favorable than the market exchange rate.

■ Although the evidence did show that the purpose of arranging for payment by means of a letter of credit was to permit SECOMAN to choose an advantageous time to convert the letter into currency, GE del Caribe has failed to establish that such a strategy is, in fact, illegal under Peruvian law. For example, it is not clear that the duty to deposit the proceeds from export transactions extends to forms of payment other than payment in currency, such as payment by letter of credit. Moreover,

SECOMAN presented evidence that even when payment is made in currency, the duty to deposit the proceeds does not arise until the transaction is consummated. Because SECOMAN had not shipped any cotton when GE del Caribe breached the Agreement, it does not appear that SECOMAN was yet under a duty to deposit the $100,000 in the Central Bank.

### B. Damages

Reviewing the district court's findings as to damages for clear error, we find only one. The district court's award of damages to SECOMAN apparently failed to take into account the $100,000 that was paid up front to Mr. Gordillo as a deposit on the Agreement. The district court did not make an explicit finding that the deposit was not to be considered an advance on the payment due under the Agreement, and we would consider any such finding to be clearly erroneous. We will therefore reduce the award of damages contained in the district court's judgment by $100,000.

■ We reject, however, GE's contention that the award of damages should be reduced by the amount of taxes that SECOMAN would have had to pay on the proceeds from this sale. Such a reduction might have been in order only upon proof that SECOMAN would not be liable for payment of taxes on its award, *see Atlas Truck Leasing, Inc. v. First N.H. Banks, Inc.*, 808 F.2d 902, 905 (1st Cir.1987), and no such proof was provided.

We also do not agree with GE del Caribe's argument that the district court erred both in determining that GE del Caribe acted with *dolus* and in its calculation of damages. A party acts with *dolus* when that party willfully fails to perform an obligation. *See* C. Civ. art. 1318. A determination that a breaching party acted with *dolus* has a substantial effect upon the damages available to the injured party. Any person breaching a contract is "responsible for compensating the losses and damages [proximately] caused by

currency from B, C assigns to A the proceeds of its international sales, denominated in dollars.
GE del Caribe's suggestion is that the Agreement in this case specified the relationship be-

tween A and C, where A is GE del Caribe, and C is SECOMAN.

its failure to perform." *See* C. Civ. art. 1321. However, a person who breaches a contract with *dolus* is also liable for any unforeseeable damages caused by the breach. *See id.* GE del Caribe correctly states that a finding of *dolus* requires a finding that the breaching party intentionally breached an obligation that it knew was binding, and that a court must analyze the subjective intent of the breaching party in order to make a finding of *dolus.*

■ In its opinion, however, the district court found that GE del Caribe *"knew* that by failing to tender a negotiable letter of credit, it was performing an act contrary to the contractual obligations it had assumed" under the Agreement. The court's conclusion was based on evidence indicating that SECOMAN had informed GE del Caribe of its pressing need for the negotiable letter of credit, that at least some GE del Caribe employees were aware that the Agreement required payment to be made by means of an irrevocable letter of credit, and that GE del Caribe was concerned about the significant decline in the price of cotton. The court also found the letter sent by GE del Caribe on June 11, 1990, in which GE del Caribe claimed that SECOMAN's rejection of the terms of the letter of credit "release[d] and excuse[d][it] from any and all performance [under the Agreement]," to be evidence probative of bad faith. In particular, the letter indicates that GE del Caribe felt the need to find a way to be released from the Agreement, which in turn supports the implication that it knew itself to be bound by the Agreement. Reviewing these findings only for clear error, with due deference to the trier of fact's greater ability to gauge the demeanor and credibility of the witnesses, we cannot say that the district court's findings were clearly erroneous.

GE del Caribe also raised several other challenges to the district court's calculation of damages, including claims that the court should have reduced the award of damages by the amount by which the Peruvian foreign exchange restrictions would have reduced SECOMAN's profits, that the court should not have based its award of damages on the assumption that SECOMAN had actually purchased 1000 tons of cotton, that there was no evidence from which the court could conclude that SECOMAN suffered losses on "cover sales," that the court failed to deduct $200,000 attributable to Mr. Manuel Bentin's partial ownership of the cotton, and that the court should not have compensated SECOMAN for the liability it incurred when it breached two subsequent contracts for the sale of cotton. We affirm the district court on these points, substantially for the reasons expressed in its opinion.

## C. Attorney's Fees

GE del Caribe contends that the district court's award under P.R. R. Civ. P. 44.1(d) was erroneous because Puerto Rico law was inapplicable to this case. In the alternative, GE del Caribe claims that, even if Rule 44 were applicable to this case, the district court abused its discretion in finding that GE del Caribe had litigated in an obstinate manner. We disagree with both claims.

■ In general terms, a federal court sitting in diversity applies the substantive law of the forum state and federal procedural rules. *See* 28 U.S.C. § 2072 (the "Rules Enabling Act"); *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Woods–Leber v. Hyatt Hotels of P.R., Inc.,* 124 F.3d 47, 50 (1st Cir.1997). A state law "that would be controlling in an action upon the same claim by the same parties in a State court" is substantive for *Erie* purposes if it would "significantly affect the result of a litigation for a federal court to disregard it." *Guaranty Trust Co. v. York,* 326 U.S. 99, 109, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945). It has long been the law in this circuit that P.R. R. Civ. P. 44.1 is substantive for *Erie* purposes. *See Dopp v. Pritzker,* 38 F.3d 1239, 1252 (1st Cir.1994); *Pan Am. World Airways, Inc. v. Ramos,* 357 F.2d 341, 342 (1st Cir.1966). State conflict of laws rules are also considered substantive for purposes of the *Erie* doctrine. *See Day & Zimmermann, Inc. v. Challoner,* 423 U.S. 3, 4, 96 S.Ct. 167, 46 L.Ed.2d 3 (1975); *Klaxon v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *New Ponce Shopping Ctr. v. Integrand Assurance Co.,* 86 F.3d 265, 267 (1st Cir.1996). The courts of the Common-

wealth of Puerto Rico have consistently followed the choice of law rules laid out in the Restatement (Second) of Conflict of Laws. *See, e.g., Efectos Litográficos, C.A. v. National Paper & Type Co. of Puerto Rico,* 112 P.R. Dec. 389, 396–97 (1982); *Partido Popular Democrático v. Barreto Pérez,* 111 P.R. Dec. 199, 256 (1981); *Archilla Y Mauricio Cucalon v. Smyth Worldwide Movers, Inc.,* 106 P.R. Dec. 538, 550 (1977); *Green Giant Co. v. Tribunal Superior,* 104 P.R. Dec. 489, 499 (1975); *Fernández Vda. De Fornaris v. American Surety Co. of New York,* 93 P.R. Dec. 29, 48 (1966). Pursuant to section 122 of the Restatement, "[a] court usually applies its own local law rules prescribing how litigation shall be conducted even when it applies the local law rules of another state to resolve other issues in the case." Restatement (Second) of Conflict of Laws § 122 (1969).

GE's contention is that Rule 44.1 is applicable only in those diversity cases in which the merits of the controversy are determined on the basis of the substantive law of Puerto Rico. GE del Caribe concludes that, since Puerto Rico's conflict of laws rules establish that Peruvian law governs the underlying dispute, Rule 44.1 is inapplicable to this case.

GE's argument is based upon the erroneous premise that if a particular state law is "substantive" for purposes of *Erie* analysis, it must also be substantive for purposes of conflict of laws analysis. To the contrary, the U.S. Supreme Court has "reject[ed] the notion that there is an equivalence between what is substantive under *Erie* doctrine and what is substantive for purposes of conflict of laws." *Sun Oil Co. v. Wortman,* 486 U.S. 717, 722, 108 S.Ct. 2117, 100 L.Ed.2d 743 (1988) (citing *Guaranty Trust Co.,* 326 U.S. at 108, 65 S.Ct. 1464). As the Court explained in *Sun Oil,*

> Except at the extremes, the terms "substance" and "procedure" describe very little except a dichotomy, and what they mean in a particular context is largely determined by the purposes for which the dichotomy is drawn. In the context of our *Erie* jurisprudence, ... that purpose is to establish (within the limits of applicable federal law, including the prescribed Rules of Federal Procedure) substantial uniformity of predictable outcomes between cases tried in a federal court and cases tried in the courts of the State in which the federal court sits.

486 U.S. at 726–27, 108 S.Ct. 2117. In the conflict of laws context, in contrast, the traditional substance-procedure dichotomy sought to reflect the relative interests of both the forum and of the foreign jurisdiction in having their law be applied to a case involving both forum and foreign law. *See* Restatement (Second) of Conflict of Laws § 122 cmts. a, b (1969); *see generally* James W. Moore, *Moore's Federal Practice* ¶ 0.310[1] at 3129–30 (1996). In fact, the Restatement notes that characterizations of laws as "substantive" or "procedural,"

> [W]hile harmless in themselves, have led some courts into unthinking adherence to precedents that have classified a given issue as 'procedural' or 'substantive,' regardless of what purposes were involved in the earlier classifications.... To avoid encouraging errors of that sort, the rules stated in [the Restatement] do not attempt to classify issues as 'procedural' or 'substantive.' Instead they face directly the question whether the forum's rule should be applied.

Restatement (Second) of Conflict of Laws § 122 cmt. b (1969).

In cases involving the law of a state or country other than the forum state, therefore, a district court sitting in diversity must engage in a two-step inquiry. First, the district court determines whether a particular matter is procedural or substantive for *Erie* purposes. If the matter is procedural, federal law is applied, and if substantive, the court follows the law of the forum state. Second, if a choice of law must be made, for example, because a contractual choice-of-law clause is at issue or because a tort was committed in another jurisdiction, the district court applies the law that would be applied under the conflict of laws rules of the forum state. However, "[i]n determining whether any state law will be adopted, the fact that a matter is characterized as substantive by the state courts for choice of law purposes does not connote that it will also be

substantive for purposes of *Erie*, and the converse should be true." *Maryland Cas. Co. v. Williams*, 377 F.2d 389, 393 n. 1 (5th Cir.1967). Contrary to GE's contention, therefore, the fact that Rule 44.1 is considered "substantive" for *Erie* purposes does not bar a finding that it is "procedural" for conflict of laws purposes.

Turning to the case at hand, we are faced with the question whether, pursuant to section 122 of the Restatement, the courts of the Commonwealth of Puerto Rico would apply Rule 44.1 in a suit otherwise subject to the laws of another state or country. Although we have found no Puerto Rico decision directly on point, we are confident that the Supreme Court of Puerto Rico would conclude that Rule 44.1 is a "local law rule[ ] prescribing how litigation shall be conducted." Restatement (Second) of Conflict of Laws § 122. Rule 44.1 does not modify the parties' substantive rights under the law. Instead, it serves the institutional concerns of the courts by allowing the imposition of sanctions upon parties who abuse the judicial process. After all, "[t]he purpose behind [Rules 44.1 and 44.3] is to penalize 'a losing party that because of his stubbornness, obstinacy, rashness, and insistent frivolous attitude has forced the other party to needlessly assume the pains, costs, efforts, and inconveniences of a litigation.'" *Dopp*, 38 F.3d at 1253 (quoting *Fernández Marino Y Otros v. San Juan Cement Co.*, 118 P.R. Dec. 713, 718 (1987)).

Our conclusion is reinforced by an evaluation of the four factors listed by the Restatement to be taken into consideration in making this determination: (1) "whether the issue is one to which the parties are likely to have given thought in the course of entering into the transaction"; (2) "whether the issue is one whose resolution would be likely to affect the ultimate result in this case"; (3) "whether the precedents have tended consistently to classify the issue as 'procedural' or 'substantive' for choice-of-law purposes"; and (4) "whether an effort to apply the rules of the judicial administration of another state would impose an undue burden upon the forum." *See* Restatement (Second) of Conflict of Laws § 122 cmt. a.

First, there is no evidence whatsoever that the parties intended to exclude the applicability of Rule 44.1, or to make applicable to this case the litigation rules of another forum. Second, we do not agree that "the issue is one whose resolution is likely to affect the ultimate result of the case," Restatement (Second) of Conflict of Laws § 122 cmt. a, because, although the imposition of sanctions under Rule 44.1 does entail the payment of a monetary penalty, the penalty is not a remedy arising out of the cause of action. Third, laws providing for awards of attorneys' fees have not been consistently classified as either "procedural" or "substantive" for choice-of-law purposes, either in Puerto Rico or elsewhere. *Compare Du–Wel Products v. United States Fire Ins.*, 236 N.J.Super. 349, 565 A.2d 1113, 1120 (1990) (Michigan counsel fee law held procedural and therefore inapplicable to suit brought in New Jersey state court), *with Aries v. Palmer Johnson, Inc.*, 153 Ariz. 250, 735 P.2d 1373, 1380 (App.1987) (Arizona law providing for award of attorney's fees was substantive); *cf. Arno v. Club Med Boutique, Inc.*, 134 F.3d 1424, 1425–26 (9th Cir.1998) (leaning toward treating fees issue as procedural, but noting that some courts have held the contrary).

Fourth, "an effort to apply the rules of the judicial administration of" Peru "would impose an undue burden upon the" courts in Puerto Rico. Restatement (Second) of Conflict of Laws § 122 cmt. a. For example, this court has not been able to determine what the Peruvian law of civil procedure would provide in a situation such as the one at hand.[9] In any case, Peruvian civil procedure

---

9. In its brief, GE del Caribe states that "Peru does have a procedural 'loser pay[s]' rule which has no applicability to a trial in Puerto Rico." We note that, aside from the fact that GE del Caribe fails to provide a citation to that rule, GE's view of its applicability is not entirely consistent with its claim that Rule 44.1 is "substantive." Peru's "loser pays" rule, which presumably always provides an award of attorney's fees to the prevailing party in a suit, has a much better claim to being "substantive" than a rule awarding attorney's fees only as a sanction for frivolous litigation. After all, a "loser pays" rule could be conceived of as adding an award of attorney's

is not as easily transplanted as its substantive law of obligations and contracts.

 Finding that the district court did not err as a matter of law in determining that GE del Caribe's conduct in this case should evaluated under Rule 44.1, we turn next to the question whether the district court abused its discretion in determining that GE del Caribe behaved in a manner deserving of sanctions under that rule. *See Dopp*, 38 F.3d at 1253 (explaining that appellate review of orders imposing sanctions under Rule 44.1 is for abuse of discretion). Rule 44.1(d) provides, in pertinent part: "In the event any party or its lawyer has acted obstinately or frivolously, the court shall, in its judgment, impose on such person the payment of a sum for attorney's fees which the court decides corresponds to such conduct." "The purpose behind [Rule 44.1] is to penalize 'a losing party that because of his stubbornness, obstinacy, rashness, and insistent frivolous attitude has forced the other party to needlessly assume the pains, costs, efforts, and inconveniences of a litigation.'" *Dopp*, 38 F.3d at 1253 (quoting *Fernández Marino Y Otros v. San Juan Cement Co.*, 118 P.R. Dec. 713, 718 (1987)). For the reasons already discussed above, we have affirmed the district court's determination that GE del Caribe breached its obligations under the Agreement in bad faith. A finding of bad faith implies that GE del Caribe was aware that it was breaching its obligations under the Agreement when, in June 1990, it attempted unilaterally to terminate the Agreement. We thus find no abuse of discretion in the district court's further conclusion that GE del Caribe's complete denial of liability, by forcing the plaintiffs and the court to undergo the expense of litigating a full trial, was an obstinate posture deserving of sanctions under Rule 44.1.

## IV. Conclusion

·For the foregoing reasons, we **affirm** the district court's judgment on the issue of liability, but reduce the award of damages by

fees to the recovery provided by the underlying cause of action. If both Rule 44.1 and the unnamed Peruvian rule were "substantive" for conflict of laws purposes, we would be forced to

$100,000. Furthermore, we **affirm** the district court's imposition of sanctions under P.R. R. Civ. P. 44.1. Costs are awarded to appellees.

choose between them, and it is not obvious that we would choose Rule 44.1 over the Peruvian rule.