NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

BERNARDINO P., *Appellant,*

*v.*

DEPARTMENT OF CHILD SAFETY, J.P., *Appellees.*

No. 1 CA-JV 21-0160
FILED 10-26-2021

Appeal from the Superior Court in Maricopa County
No.  JD38630
The Honorable Sam J. Myers, Judge

**AFFIRMED**

COUNSEL

Law Office of Ed Johnson, PLLC, Peoria
By Edward D. Johnson
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Emily M. Stokes
*Counsel for Appellee Department of Child Safety*

_____

**MEMORANDUM DECISION**

Judge Maurice Portley[1] delivered the decision of the Court, in which Presiding Judge Jennifer B. Campbell and Judge Samuel A. Thumma joined.

_____

**P O R T L E Y**, Judge:

¶1        Bernardino P. ("Father") appeals the order severing his parental rights to his son, J.P.  Father challenges the juvenile court's findings that (1) his 11.25-year prison sentence would deprive J.P. of a normal home for a period of years and (2) terminating his parental rights was in J.P.'s best interests.  For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2        Father and Martha S. ("Mother") are the biological parents of J.P., who was born in February 2010.  Mother is also the biological parent of J.P.'s older half-sister.[2]

¶3        In 2012, Father was sentenced to prison after a domestic-violence incident against Mother.  He was released in 2014, but was again arrested in 2015, convicted of aggravated assault, and sentenced to 11.25 years in prison.  Father's release date is in December 2024.

¶4        In October 2019, Mother left the children with her mother ("Maternal Grandmother") and did not return.  Later that month, Maternal Grandmother filed a dependency petition, alleging J.P. was dependent as to Father given his incarceration.  The Department of Child Safety ("DCS") substituted in as petitioner, and J.P. was found dependent as to Father in February 2020, when Father did not contest the allegations.

¶5        In late 2019, a DCS case manager contacted Father in prison and encouraged him to write to his child.  From late summer 2020 until the April 2021 severance trial, Father sent J.P. approximately five letters

_____

[1]        The Honorable Maurice Portley, Retired Judge of the Court of Appeals, Division One, has been authorized to sit in this matter pursuant to Article 6, Section 3, of the Arizona Constitution.

[2]        The court terminated Mother's parental rights to both children, but she is not a party to this appeal.

through DCS. J.P.'s therapist encouraged him to read Father's letters, and by early 2021, J.P. agreed to do so, but made it clear that he wanted no other contact with Father or any relationship "in any capacity" with him based on the "things that [Father] 'did to his family.'" DCS also consulted with a psychologist about implementing visits between J.P. and Father, but the psychologist strongly recommended against it, opining that visitation could further damage the relationship if J.P. was forced to visit with Father when he was not ready.

¶6            After the court changed the case plan from family reunification to severance and adoption, DCS moved to terminate Father's parental rights based on length of felony sentence. *See* Ariz. Rev. Stat. ("A.R.S.") § 8-533(B)(4).

¶7            In April 2021, the juvenile court conducted a severance adjudication. Father conceded he had been incarcerated for most of J.P.'s life, had not seen J.P. since he was two years old, had little contact with him over the years, and could not parent him until some undetermined time after Father's release. He testified he had tried to correspond with J.P. on holidays and birthdays and through at least one family member, however, and in total, he had sent ten letters to J.P., some before DCS became involved. He also claimed he would have sent more letters, but DCS did a poor job of communicating with him and did not tell him where to send letters until August or September 2020. He admitted, however, that a DCS case manager had contacted him in 2019. He also testified that he had engaged in prison programs and become a "peer counselor" to improve his ability to repair his relationship with J.P.

¶8            The court terminated Father's parental rights on the length-of-felony-sentence ground. We have jurisdiction over Father's timely appeal. *See* A.R.S. §§ 8-235(A), 12-2101(A)(1).

## ANALYSIS

### I.        Standard of Review and Applicable Law

¶9            To sever a parent-child relationship, the juvenile court must find by clear and convincing evidence at least one of the statutory grounds set forth in A.R.S. § 8-533(B) and must find by a preponderance of the evidence that severance is in the child's best interests. *Raymond F. v. Ariz. Dep't of Econ. Sec.*, 224 Ariz. 373, 376-77, ¶¶ 14-15 (App. 2010).

¶10           The juvenile court is in the best position to weigh the evidence, observe the parties, judge witnesses' credibility, and resolve

disputed facts, *Jordan C. v. Ariz. Dep't of Econ. Sec.*, 223 Ariz. 86, 93, ¶ 18 (App. 2009), and we will not reweigh conflicting evidence or redetermine credibility, *see Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 151-52, ¶¶ 18-19 (2018). Instead, we view the evidence and reasonable inferences to be drawn therefrom in the light most favorable to affirming and will not reverse unless no reasonable evidence supports the court's factual findings. *Ariz. Dep't of Econ. Sec. v. Matthew L.*, 223 Ariz. 547, 549, ¶ 7 (App. 2010).

II.     *Termination Pursuant to A.R.S. § 8-533(B)(4)*

¶11     Father argues that insufficient evidence supports termination of his parental rights on the length-of-felony-sentence ground.

¶12     The juvenile court may terminate parental rights under the length-of-felony-sentence ground if "[t]he parent is deprived of civil liberties due to the conviction of a felony . . . [and] if the sentence of that parent is of such length that the child will be deprived of a normal home for a period of years."  A.R.S. § 8-533(B)(4).  No bright-line rule exists for determining when a sentence is long enough to deprive a child of a normal home for a period of years. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 251, ¶ 29 (2000).  Instead, the juvenile court

> should consider all relevant factors, including, but not limited to: (1) the length and strength of any parent-child relationship existing when incarceration begins, (2) the degree to which the parent-child relationship can be continued and nurtured during the incarceration, (3) the age of the child and the relationship between the child's age and the likelihood that incarceration will deprive the child of a normal home, (4) the length of the sentence, (5) the availability of another parent to provide a normal home life, and (6) the effect of the deprivation of a parental presence on the child at issue.

*Id.* at 251-52, ¶ 29.  It is not necessary for all factors to support terminating parental rights, nor is there any "threshold level" under each individual factor that either compels, or forbids, severance. *Christy C. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 445, 450, ¶ 15 (App. 2007).

¶13     As to the first factor—the length and strength of the parent-child relationship before incarceration—the court found that Father's relationship with J.P. was "minimal" given Father was first incarcerated in 2012 when J.P. was only two, was released for a short period from 2014 to 2015, and then he was returned to custody in 2015.  Father did not offer any evidence of efforts to contact J.P. while in prison, and during his release he

did not see J.P. Although Father blames DCS and his inability to contact DCS due to COVID-19 lockdown protocols, the factor focuses on the relationship *before* a parent's incarceration, and he was twice incarcerated years before DCS's involvement. And when Father was incarcerated for the second time in 2015, J.P. had essentially no relationship with him.

**¶14** Moving to the second factor, the court found that although Father had written ten letters to J.P. over several years, J.P. continued to refuse contact with Father and the relationship was "badly fractured" long before DCS became involved. Father claims Maternal Grandmother repelled his attempts to nurture a relationship with J.P., but the court was not required to accept his unsupported testimony. *See Aries v. Palmer Johnson, Inc.*, 153 Ariz. 250, 261 (App. 1987). Further, the record supports the conclusion that Father put little effort into maintaining a relationship with J.P., whether during his 2012 incarceration, after he was released in 2014, or for the first five years after 2015 when he was in prison. On this record, Father's relationship with J.P. had not been, and could not be, "successfully continued or [] nurtured" during Father's incarceration.

**¶15** As to the next three factors, the court found J.P. was eleven years old at the time of the trial and Father would not be released from his 11.25-year sentence until December 2024, which was "just before he turns 15." *See Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 281, ¶ 8 (App. 2002) (holding that the court must consider the entire sentence length). The court concluded J.P. had "been deprived of a normal home due to his father's incarceration for nearly his entire childhood," and no other parent was available because he had been abandoned by Mother. Despite his argument that J.P. is now in a stable home and he might be able to reunite with him upon his release from prison, the term "normal home" generally refers to the obligation of a parent to provide a home in which that parent has a presence, not to a home environment created by a foster parent or relative. *Jessie D. v. Dep't of Child Safety*, CV-19-0321-PR, 2021 WL 4699561, at *2, ¶ 9 (Ariz. Oct. 8, 2021) (citing *Maricopa Cnty. Juv. Action No. JS-5609*, 149 Ariz. 573, 575 (App. 1986)); *but see Timothy B. v. Dep't of Child Safety*, 250 Ariz. 139, 145, ¶ 19 (App. 2020) (suggesting a broader definition of the term "normal home" might be appropriate in some cases). Currently, there is no other parent available to give J.P. a normal home life. Moreover, due to his history of violence, Father will likely need to engage in prolonged reunification services before he can reunite with J.P. *See Jeffrey P. v. Dep't of Child Safety*, 239 Ariz. 212, 214, ¶ 10 (App. 2016) (recognizing the court may consider circumstances that could delay reunification after release, such as release conditions and the time needed for a parent to complete services

after release). Consequently, J.P. has been, and will likely be, deprived of a "normal home" for many more years.

¶16 Finally, as to the effect of the deprivation of a parental presence on J.P., Father argues his absence will "cause no effect" because he can continue to have contact with J.P. while incarcerated. But J.P. has been deeply affected by Father's absence, barely remembers meeting him, and wants no relationship with him. And Father's claim that he and J.P. "have had frequent contact" is unsupported by the record.

¶17 The reasonable evidence supports the court's findings and conclusion that the length of Father's felony sentence will deprive J.P. of a normal home for a period of years. Accordingly, we affirm the order severing Father's parental rights.

### III. J.P.'s Best Interests

¶18 Father also argues that termination of his parental rights was not in J.P.'s best interests.

¶19 Termination may be in a child's best interests if the child will benefit from termination *or* if the child will face harm if the relationship continues. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 4, ¶ 16 (2016). In making the determination, the court properly evaluates the totality of circumstances at the time of trial, considering factors such as the bond between the natural parent and the child, the availability of an adoptive placement, any risk for abuse or neglect if the relationship is not terminated, and the benefit of placement with a sibling. *See Alma S.*, 245 Ariz. at 150-51, ¶ 13; *Dominique M. v. Dep't of Child Safety*, 240 Ariz. 96, 98-99, ¶¶ 10-12 (App. 2016); *Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376, 378, ¶ 6 (App. 1998).

¶20 Here, the juvenile court found J.P. would benefit from termination because he is thriving in Maternal Grandmother's loving and nurturing care and she wants to adopt him, which will provide him with permanency and stability.[3] The court also found J.P. is otherwise adoptable because he is healthy, well-behaved, and smart. The findings are supported by the evidence, including J.P.'s desire to be adopted so he and his half-sister can continue to stay together. And Maternal Grandmother has expressed a willingness to facilitate contact between J.P. and Father if J.P. expressed a desire for such contact.

---

[3] Father contends that he and J.P. shared a bond because they drew pictures for each other, but the record does not support his contention.

**¶21** The court also found J.P. would be harmed by continuation of the parent-child relationship because he had no parent available to care for him. Further, since J.P. wanted no relationship with Father and wants to be adopted, reasonable evidence supports the court's finding that terminating Father's rights was in J.P.'s best interests.

## CONCLUSION

**¶22** The juvenile court's order terminating Father's parental rights to J.P. is affirmed.

